**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ST. LUKE TECHNOLOGIES, LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> CHECK POINT SOFTWARE TECHNOLOGIES, LTD. AND CHECK POINT SOFTWARE TECHNOLOGIES, INC., <br><br> *Defendants*. | Civil Action No._____ <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff St. Luke Technologies, LLC ("St. Luke" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent Nos. 8,316,237 ("the '237 patent"), 8,904,181 ("the '181 patent"), and 7,587,368 ("the '368 patent) (collectively, the "patents-in-suit").  Defendants Check Point Software Technologies, Ltd. and Check Point Software Technologies, Inc. (collectively "Check Point" or "Defendant") infringes the patents-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*

## INTRODUCTION

1. In an effort to expand their product base and profit from the sale of infringing cloud computing encryption technologies and information record infrastructure technologies, Check Point has unlawfully and without permission copied the technologies and inventions of Dr. Robert H. Nagel, David P. Felsher, and Steven M. Hoffberg.

2. Dr. Nagel, Mr. Felsher, and Mr. Hoffberg are the co-inventors of the '237 patent, the '181 patent, and U.S. Patent Nos. 7,181,017 ("the '017 patent"); 7,869,591 ("the '591 patent"); and 8,566,247 ("the '247 patent") (collectively, the "Secure Third-Party

1

Communications Patents" or "STPC patents").  The STPC patents have been cited in over 1,800 United States patents and patent applications as prior art before the United States Patent and Trademark Office.  Defendants have cited the STPC patents as relevant prior art.

3. The STPC patents disclose systems and methods for secure communications over a computer network where a third party (intermediary) performs a requisite function with respect to the transaction without requiring the intermediary to be trusted with respect to the private information or cryptographic keys for communicated information.  The inventions taught in the STPC patents employ secure cryptographic schemes, which drastically reduce the risk of unauthorized disclosure of encrypted data.

4. The below diagram shows St. Luke's STPC patents, pending STPC patent applications, and the STPC patents Check Point infringes.[1]



---

[1] St. Luke's STPC patents are in two patent families claiming priority to U.S. Patent Applications 60/278,317 and 60/890,498.

5.      Mr. Felsher is the inventor of the '368 patent and U.S. Patent Nos. 7,805,377 ("the '377 patent"); 8,498,941 ("the '941 patent"); 8,380,630 ("the '630 patent"); and 8,600,895 ("the '895 patent") (collectively, "Information Record Infrastructure Patents" or "IRI patents"). The IRI patents have been cited by over 1,800 United States patents and patent applications as prior art before the United States Patent and Trademark Office.  The IRI patents have been cited as prior art in Check Point's own published patents.[2]

6.      The IRI patents disclose systems and methods for distributing and granting access to data where data is stored in multiple external computer databases.  The IRI patents address the difficult problem of authorizing access to protected information records where authorization will depend based on the access privileges of the user.

7.      The below diagram shows the IRI patent family tree and a pending IRI patent application.



---

[2] *See* U.S. Patent No. 7,590,0684, entitled, "System Providing Methodology for Access Control with Cooperative Enforcement," assigned to Check Point Software Technologies, Inc.; U.S. Patent App. No. 2004/0167984, entitled "System Providing Methodology for Access Control with Cooperative Enforcement," assigned to Check Point Software Technologies, Inc.

## THE INVENTORS' LANDMARK SECURE COMMUNICATION SYSTEMS

8.     Mathematician Dr. Robert Nagel, the named inventor of two patents-in-suit, pioneered development of large-scale computer-based data distribution systems.  In the 1970s Dr. Nagel developed some of the first computer systems for distributing encrypted data over computer networks.  Dr. Nagel is the named inventor of twenty-three United States Patents.  Dr. Nagel's patents have been cited thousands of times by various companies.  Later in life, Dr. Nagel founded two publicly traded companies, and served as a representative to the United Nations.

9.     In 1975, Dr. Nagel developed a system harnessing burgeoning microprocessor power to broadcast stock prices and related data over coaxial cable and telephone networks.  Dr. Nagel's patented system was the foundation of Reuters's high-speed transmission technologies for distributing real-time market information.

> Computer power behind the new information system is provided by a Digital Equipment Corp. PDP-8E with 32K memory and a multiprocessor system consisting of one PDP-11/35 with 64K memory and 2 PDP-11/50s, each with 96K memory.
>   The system was developed by Robert H. Nagel of IDR. Another patent for the high-speed transmission technique is expected to be issued shortly.

REUTERS GETS NEWS SYSTEM PATENT, COMPUTERWORLD at 36, April 23, 1975 (describing Dr. Nagel's development of one of the first terminals for displaying real-time stock market data).[3]

10.     The data distribution system developed by Dr. Nagel in the mid-1970s was commercialized by Reuters and allowed the rapid transmission of market and news information over coaxial cable and telephone lines.[4]

---

[3] See U.S. Patent Nos. 3,875,329, which issued on April 1, 1975.  Dr. Nagel's work at IDR, Inc. (a subsidiary of then Reuters Group PLC) lead to the development of U.S. Patent Nos. 3,889,054; 4,042,958; 4,064,494; 4,120,003, 4,135,213; and 4,148,066.  These patents have been cited in over 830 patent applications and issued patents of companies including Cisco Technology, Inc., Sony Corporation, Intel Corporation, etc.

[4] REUTERS TECHNICAL DEVELOPMENT CHRONOLOGY 1975-1979, THE BARON, July 13, 2015). http://thebaron.info/archives/technology/reuters-technical-development-chronology-1975-1979.



IMAGE OF THE DEC PDP-11/50 SYSTEM, COLUMBIA UNIVERSITY COMPUTING HISTORY ARCHIVE (circa 1976), http://www.columbia.edu/cu/computinghistory/ (showing an installed PDP-11/50 device that was a component in Dr. Nagel's data distribution system).

11.    Reuters sold thousands of information systems modeled on Dr. Nagel's patented inventions.[5]  Hundreds of companies including IBM, Intel, and Xerox cite Dr. Nagel's groundbreaking inventions described in his patents as relevant prior art in their own patents.[6]

---

[5] REUTERS TECHNICAL DEVELOPMENT CHRONOLOGY 1975-1979, THE BARON, July 13, 2015, http://thebaron.info/archives/technology/reuters-technical-development-chronology-1975-1979 (More than 10,000 units are eventually produced.  It revolutionizes the Monitor product financials and field staffing and provides valuable cash flow for IDR.").

[6] PROCEEDINGS OF THE DIGITAL EQUIPMENT USERS SOCIETY, DIGITAL EQUIPMENT CORPORATION PROCEEDINGS Vol. 3 Issue 1 at 1 (1977) ("Reuters has developed a network to assist stock and commodity brokers and foreign exchange dealers by giving them the latest prices and rate of exchange via terminals in this book."); ANNUAL REVIEW OF INFORMATION SCIENCE AND TECHNOLOGY, AMERICAN SOCIETY OF INFORMATION SCIENCE, AMERICAN DOCUMENTATION INSTITUTE Vol. 12 at 223 (1977) ("Reuters provides the user with a 1.2 Kbps leased connection to the nearest network processor or multiplexor.  The Monitor user configuration is a Digital Equipment Corporation PDP 8 with up to three display units."); REUTERS BLENDS CATV & COMPUTER SKILLS IN NEWS RETRIEVAL SYSTEM, DATA PROCESSING DIGEST at 12 (1975) ("Reuters has introduced in New York a high-speed information retrieval system for the investment community.  The system was developed by Information Dissemination and Retrieval, Inc. (IDR), a Reuters subsidiary, and uses the high-speed transmission capacity of coaxial cable with television and computer technology.").



A new, high-speed information retrieval system capable of serving the investment community and the cable TV viewers at home was announced late in December by Reuters. Called the IDR system – after the Reuter subsidiary set up to develop it – it utilizes the high-speed transmission capacity of coaxial cable along with television and computer technology to make retrieval services available to a wide variety of subscribers. Fast access time of about 2 ½ seconds is possible.

REUTERS ANNOUNCES RETRIEVAL SYSTEM FOR CABLE TV SUBSCRIBERS, BROADCAST MANAGEMENT/ENGINEERING MAGAZINE at 9, February 1975.

12.     In the 1990s, Dr. Nagel was the Chief Technology Officer of eSecure Docs, Inc., Founder of Digits Corporation, and Executive Vice President and Chief Technology Officer of InfoSafe Systems, Inc.[7]  Publications including Fortune Magazine and ComputerWorld described Dr. Nagel as a "noted computer scientist" for his groundbreaking work[8]—work that led to the inventions disclosed in the patents-in-suit.

> The technology Nagel designed at InfoSafe Systems, Inc., won the Seybold Award for Excellence as the "most innovative product of the year." His work in high technology received major press coverage in such publications as Fortune, Forbes, and Business Week. He testified before Congress on the capabilities of a system he designed for NASDAQ.

*Aliye Pekin Celik*, OUR COMMON HUMANITY IN THE INFORMATION AGE: PRINCIPLES AND VALUES FOR DEVELOPMENT at 191 (2007).

13.     Following his development of groundbreaking electronic data distribution systems for Reuters, Dr. Nagel used his insights to develop the secure communications technologies that are used today by Check Point and many of the world's largest corporations without attribution or compensation.

---

[7] In addition to his work in private industry, Dr. Nagel served as a consultant to the Defense Advanced Research Projects Agency ("DARPA"), responsible for the development of emerging technologies used by the U.S. Department of Defense.  Dr. Nagel was a designer of the Navy's Tactical Air Navigation System ("TACAN") and assisted in the development of the nuclear reactor that powers the Navy's Seawolf class of nuclear submarines.  Dr. Nagel was also the developer of the Hot Well Liquid Level Control system that is a part of the control system of the nuclear power plant aboard the Seawolf, Defender and other submarines.

[8] *See* Rick Tetzeli, et al., *Fortune Checks Out 25 Cool Companies For Products, Ideas, And Investments*, FORTUNE MAGAZINE, July 11, 1994.

14.    Dr. Nagel foresaw the need for enabling secure communications between two parties wherein an intermediary performs a requisite function with respect to the transaction without requiring the intermediary to be trusted with respect to the private information or cryptographic keys for communicated information.

15.    Dr. Nagel's interest in developing secure systems for the provision of highly secure data was driven in part by his experience being totally blind.[9]  Dr. Nagel recognized that the growing adoption of the Internet and increased computational power presented unique challenges to the security of medical records.  Dr. Nagel also had the insight that the challenges presented in controlling access to secure medical records could be applied outside the context of medical records, with wide applicability to the security of data on networks where an intermediary could have access to secure information.

16.    The rise of cloud computing (the delivery of on-demand computing resources over a distributed network), has made Dr. Nagel and his co-inventors' insights uniquely valuable. Medical records, financial information, email messages, and other forms of electronic data are now placed on remote servers and accessed via a network by a diverse variety of users, under a diverse variety of circumstances.

17.    The inventions disclosed in the STPC patents address shortcomings in systems available at the time of the patents' conception—for example, the need for users in particular contexts, to access and/or modify data stored at or by an intermediary without allowing the intermediary to access an unencrypted version of the data.

18.    Prior art systems such as the "Micali Fair Encryption scheme do[] not . . . allow communications of a secret in which only one party gains access to the content, and in which the

---

[9] Dr. Nagel served as a representative to the United Nations Committee that authored the International Convention on the Protection of the Rights of Dignity of Persons with Disabilities *See* Jan Jekielek, *Human Rights Panel Explores Implementation of Rights and Global Well-Being*, Epoch Times, December 3, 2010, http://www.cccun.net/cccun-12-2-10-eventepochtim.pdf ("Nagel, who is blind himself.  He expounded on the remarkable accomplishment that is the Convention on the Rights of Persons with Disabilities, the 21st century's first U.N. human rights convention.").

third party or parties and one principal operate only on encrypted or secret information." '237 patent, col. 2:40-44.



'237 Patent Fig. 1.

19.     Dr. Nagel worked with Steven Hoffberg and David P. Felsher to develop the systems and methods disclosed in the STPC patents.  The inventions taught in these patents relate to the secure transmission of data—for example, wherein an intermediary performs a requisite function with respect to a secure data transmission without requiring the intermediary to be trusted with the private, secure contents of the transmission and/or without requiring the intermediary to have access to the cryptographic keys required to access the protected information.  The STPC patented systems and methods employ secure cryptographic schemes, which reduce the risks and liability of unauthorized disclosure of private information as it travels across a network.

20.     Mr. Hoffberg holds a Master of Science degree from the Massachusetts Institute of Technology and an advanced degree in electrical engineering from Rensselaer Polytechnic

Institute.  Mr. Hoffberg is a named inventor on sixty-seven patents in the fields of telematics, wireless ad hoc networking, image and audio signal processing, and cryptography.  Mr. Hoffberg also spent three years in the University of Connecticut Medical School Medical Doctorate Program.

21.    Mr. Felsher is an appellate attorney, health care activist, and inventor.  After graduating from MIT with a Bachelor of Science Degree in Chemistry, Mr. Felsher went on to earn an MBA from the Wharton School of Business of the University of Pennsylvania and a J.D. from Fordham Law School.[10]  Mr. Felsher has served as counsel to the Association of American Physicians and Surgeons, Inc.

22.    The STPC patents have been cited by 1,070 United States patents and published patent applications as prior art before the United States Patent and Trademark Office.[11] Companies whose patents cite the Secure Third-Party Communication Patents include:

- Microsoft Corporation
- Nokia Corporation
- Apple, Inc.
- International Business Machines Corporation
- Massachusetts Institute Of Technology
- Ncr Corporation
- Netapp, Inc.
- Adobe Systems Incorporated
- American Express Travel Related Services Company, Inc.
- AT&T Intellectual Property LLP
- Canon Kabushiki Kaisha
- Hytrust, Inc.
- Cisco Technology, Inc.
- Intuit Inc.
- Cloudera, Inc.
- Novell, Inc.
- Google Inc.
- Teradata Us, Inc.
- Mitsubishi Electric Corporation
- Texas Instruments Inc.
- Unitedhealth Group Incorporated
- Fujitsu Limited

[10] During his legal career, Mr. Felsher has been counsel of record on seventeen briefs to the United States Supreme Court.

[11] The 1,070 forward citations to the Secure Third-Party Communication Patents do not include patent applications that were abandoned prior to publication in the face of the Secure Third-Party Communication Patents.

9

- Hewlett-Packard Development Company, L.P.
- Verizon Patent and Licensing Inc.
- Visa U.S.A. Inc.
- Western Digital Technologies, Inc.
- Xerox Corporation
- Yahoo! Inc.
- Koninklijke Philips Electronics, N.V.
- Zynga Inc.
- Square, Inc.
- Sprint Communications Company L.P.
- Sony Corporation
- Siemens Aktiengesellschaft
- Sharp Laboratories of America, Inc.
- Sap AG
- EMC Corporation
- Samsung Electronics Co., Ltd.
- Ricoh Co., Ltd.
- Red Hat, Inc.
- Panasonic Corporation
- Broadcom Corporation
- Oracle International Corporation

The inventions taught in the STPC patents relate to the encryption of data passed through an intermediary and have been recognized by Check Point as important and valuable.

23.    The IRI patents have been cited by 1,800 United States patents and published patent applications as prior art before the United States Patent and Trademark Office.[12] Companies whose patents cite the IRI patents include:

- Bank of America Corporation
- Siemens Medical Solutions Health Services Corporation
- AthenaHealth, Inc.
- Robert Bosch Gmbh
- Thompson Reuters (Healthcare) Inc.
- Northrop Grumman Information Technology, Inc.
- McKesson Corporation
- Lockheed Martin Corporation
- Sandisk Technologies Inc.
- Intel Corporation
- Greenway Medical Technologies, Inc.
- Medtronic, Inc.
- Sybase, Inc.
- General Electric Company
- Epic Systems Corporation
- Allscripts Software, LLC
- Ebay, Inc.

---

[12] The 1,800 forward citations to the IRI Patents and their related patent applications do not include patent applications that were abandoned prior to publication in the face of the IRI Patents.

- 3Com Corporation
- Oracle International Corporation
- Intuit Inc.
- Gemalto Sa
- Adobe Systems Incorporated
- Koninklijke Philips Electronics N.V.
- Electronic Data Systems Corporation
- American Express Travel Related Services Company, Inc.
- Google Inc.
- Apple, Inc.
- Mcafee, Inc.
- Hewlett-Packard Development Company L.P.
- EMC Corporation
- Blackboard Inc.
- AT&T Intellectual Property LLP
- Cerner Innovation, Inc.
- Cisco Technology, Inc.
- Citrix System, Inc.
- International Business Machines Corporation

## THE PARTIES

24.     Tyler, Texas-based St. Luke is committed to advancing the current state of innovation in the field of data encryption technologies for secure communications over a distributed network.  In addition to the ongoing efforts of Messrs. Felscher and Hoffberg, St. Luke employs a resident of Tyler, Texas as a Technology Analyst.  St. Luke is a Texas limited liability company with its principal place of business at 719 West Front Street, Suite 247, Tyler, Texas 75710.



25.     St. Luke is a small, Texas-based company.  St. Luke depends on patent protection to effectively license its innovative technologies and build its business. Like Check Point, St. Luke relies on its intellectual property.  Defendants have 155 patents and patent applications of their own in the area of network security.

11

26.     On information and belief, Defendant Check Point Software Technologies Ltd. is a Delaware corporation with a principal office located at 959 Skyway Road, Suite 2300, San Carlos, California 94070.  Check Point Software Technologies Ltd. has previously consented to the jurisdiction of this court.[13]

27.     Defendant Check Point Software Technologies, Inc., a wholly owned subsidiary of Check Point Software Technologies Ltd., is a corporation organized and existing under the laws of Delaware, with a principal place of business at 959 Skyway Road Suite 300, San Carlos, CA 94070.

28.     Defendants can be served through the registered agent for Check Point Software Technologies, Inc., Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

29.     On information and belief, and according to its website, Check Point offers infringing products for sale throughout the United States, including in the Eastern District of Texas.  In addition, Check Point has a number of substantial customers based in the Eastern District of Texas.  Further, Check Point advertises its infringing products throughout the Eastern District of Texas and claims financial benefits through its conducting of business in Texas.

30.     In addition, on information and belief, Check Point maintains offices in Irving, Texas and is registered with the Texas Secretary of State to conduct business in Texas.

## JURISDICTION AND VENUE

31.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

---

[13] *See Verifire Network Solutions, LLC v. Check Point Software Technologies Ltd*., Case No. 15-cv-00929, Dkt. No. 12 (E.D. Tex. August 24, 2015) ("Check Point admits that it is a Delaware corporation with a principal office located at 959 Skyway Road, Suite 2300, San Carlos, California 94070 and that the Court has jurisdiction over Check Point.").

32.     Upon information and belief, this Court has personal jurisdiction over Defendants in this action because Defendants have committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.  Defendants, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), have committed and continue to commit acts of infringement in this District by, among other things, offering to sell and selling products and/or services that infringe the patents-in-suit.

33.     Venue is proper in this district under 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b). Upon information and belief, Defendants have transacted business in the Eastern District of Texas and have committed acts of direct and indirect infringement in the Eastern District of Texas.

## TECHNOLOGY BACKGROUND

34.     Advances in computational power and the explosive growth of the Internet have led to the development of secure encryption systems and information record management systems that enable secure communications between two or more computers on a network where the data that is sent and/or processed by an intermediary without access to the plaintext data.

- *The STPC patents* teach specific computer based encryption systems, including systems that use composite key asymmetric cryptographic algorithms to avoid substantially revealing plaintext data during intermediate processing.
- *The IRI patents* teach specific computer based systems and methods, including systems for electronically structuring and controlling access to protected data in a plurality of external databases.

### A.     Secure Third Party Communications Patents

35.     Defendants prize systems that provide secure third party communications through an intermediary.

36.     Defendants' competitors such as Microsoft and Oracle have confirmed the importance and value of encryption systems that protect data in the Cloud.  Brendon Lynch, Chief Privacy Officer at Microsoft described the importance that Microsoft places on secure encryption in the cloud:

> We share the same concerns as our customers do around government surveillance. We know that customers will not use technology that they do not trust that is what people should know about our [Microsoft's] approach to this . . . we're implementing strong encryption right throughout our services to ensure that governments can only access data by lawful means."

Brendon Lynch, *Microsoft Privacy and Compliance in the Cloud*, TRUSTWORTHY COMPUTING - VIDEO TRANSCRIPT, January 9, 2015, https://www.youtube.com/watch?v=q5rwwQBTJxo

Vipin Samar, Vice President of database security product development at Oracle states in a 2014 press release that, "As regulations worldwide increasingly call for more data to be encrypted, organizations need a centralized solution to securely manage all the encryption keys and credential files in their data centers."  The press release continued by pointing out the importance of secure encryption in the cloud.



> and backup mechanisms. As organizations increasingly encrypt data at rest and on the network, securely managing all the encryption keys and credential files in the data center has become a major challenge.
>
> At the same time, organizations also need to comply with stringent regulatory requirements for managing keys and certificates. Many global regulations and industry standards call for audits demonstrating that keys are routinely rotated, properly destroyed, and accessed solely by authorized entities.

ORACLE CUSTOMERS SECURE CRITICAL ENCRYPTION KEYS WITH ORACLE KEY VAULT, ORACLE PRESS RELEASE, August 7, 2014.

37.     Although secure third party encryption systems that protect access to data at an intermediary are offered by major corporations today, at the time the inventions disclosed in the STPC patents were conceived, no such systems existed.

38.     The claims in the STPC patents describe a solution that is unquestionably rooted in computer technology to overcome a problem specific to and characteristic of complex computer networks.  Professor of Computer Science at Columbia University, Steven M.

Bellovin[14] described in a 1996 academic article, contemporaneous to the development of the patents-in-suit (and cited on the face of the STPC patents) that the development of modern cryptography was a reaction to the rise of the Internet as a mass medium and concerns unique to the exchange of information over the Internet.

> In early 1994, CERT announced[1] that widespread password monitoring was occuring on the Internet. In 1995, Joncheray published a paper explaining how an eavesdropper could hijack a TCP connection [Jon95]. In mid-1998, there is still very little use of cryptography. Finally, though, there is some reason for optimism.
>
> A number of factors have combined to change people's behavior. First, of course, there is the rise of the Internet as a mass medium, and along with it the rise of Internet commerce. Consider the following quote from a popular Web site:

Steven M. Bellovin, *Cryptography and the Internet*, AT&T LABS-RESEARCH, Aug. 1998, Florham Park, New Jersey.

39.     Although encryption, in some form, has been an objective of individuals (and governments) for many years, the STPC patents are directed at solving problems that are unique to the realm of computers and specifically network cloud computing.

40.     The specific technologies disclosed and claimed in the STPC patents are discussed in detail below.  However, the history of cryptography provides context for the inventions disclosed in the STPC patents and confirms that the patented inventions are limited to specific computer systems and methods addressing issues specific to modern computer networks.

41.     ***Pre-Mechanical Encryption***.  The origin of cryptography has been around since the reign of Pharaohs; however, the problems that "pre-silicon" societies faced were markedly different than those the patents-in-suit are directed at solving.  The unique solutions taught by the patents-in-suit reflect that difference.  In 1900 BC, Egyptian scribes developed a rudimentary form of cryptography that allowed the passing of messages written on papyrus.  The key to unlocking the meaning of non-standard hieroglyphs (the encrypted message or cipher) was

---

[14] At the time Professor Bellovin authored the above referenced article he was a Fellow at AT&T Labs Research.

located in an inscription on the same document.  Thus, a recipient of a message could decipher the meaning of the encoded message using the key transmitted with the message.  This early form of encryption was susceptible to frequency analysis, a method utilizing the frequency that certain letters or symbols would be used.[15]



*Alexander Stanoyevitch*, INTRODUCTION TO CRYPTOGRAPHY WITH MATHEMATICAL FOUNDATIONS AND COMPUTER IMPLEMENTATIONS PRESS (2002).

42.    Over the following four millennia, the advance of cryptography was limited.  In the mid-1400s, Leon Battista Alberti invented an encryption system using a mechanical device with sliding disks that allowed for various methods of substitution.[16]  This is the base concept of a polyalphabetic cipher, which is an encryption method that switches through several substitution ciphers throughout encryption.  Polyalphabetic substitution by rotating the discs to change the encryption logic limited the use of frequency analysis to crack the cipher.  However, polyalphabetic substitution was susceptible to plain text attacks that would try various permutations of the code.

---

[15] NIGEL SMART, CRYPTOGRAPHY: AN INTRODUCTION 3RD EDITION 40 (2004) ([U]nderlying statistics of the language could be used to break the cipher.  For example it was easy to determine which ciphertext letter corresponded to the plaintext letter *E*.").

[16] DAVID KAHN, THE CODE BREAKERS: THE STORY OF SECRET WRITING 125 (1967) (David Kahn calls Alberti "the father of western cryptography" based on his development of a device that had two copper disks that fit together.  "Each one of them had the alphabet inscribed on it.  After every few words, the disks were rotated to change the encryption logic, thereby limiting the use of frequency analysis to crack the cipher.")

43.     *Encryption in the Mechanical Age*.  In the 1920s, electro-mechanical devices were developed that used electrical signals to perform rudimentary calculations that would encrypt messages.  The Enigma machine developed by the German government at the end of World War I used mechanical devices to encrypt and decrypt messages.  Germany's Enigma device used a set of codes that, when programed into a device, would generate an encrypted message.  Ciphers generated by the Enigma could thus be decrypted if one had both possession of an Enigma device and the "crib" or the symmetric key that was used to program the device.[17] Alan Turing (among others) wanted a technique to break Enigma that did not rely on the key, which could (and frequently did) change.[18]  Turing developed several ways of using Bayesian inference coupled with "the Bombe," an electromechanical device that could detect the setting for the Enigma.



*Steve Weis*, THEORY AND PRACTICE OF CRYPTOGRAPHY 9:23 (November 2007) (image of the Enigma machine).

---

[17] DAVID KAHN, , SEIZING THE ENIGMA: THE RACE TO BREAK THE GERMAN U-BOAT CODES, 1939-1943 (1991) (In 1941 the British were able to decrypt ciphers generated by the enigma machine by discovering that portions of weather reports (Short Weather Codes) transmitted by German Warships were the symmetric key.  However, in the fall of 1941 the German cryptographers stopped using short Weather Codes as symmetric keys.  Subsequently, Germany out of abundance of caution changed the configuration of the enigma machines.).

[18] DAVID LEAVITT, THE MAN WHO KNEW TOO MUCH: ALAN TURING AND THE INVENTION OF THE COMPUTER (2006) (Turing settled on a known plaintext attack, using what was known at the time as a "crib."  A crib was a piece of plaintext that was suspected to lie in the given piece of cipher text.  The methodology of this technique was to from a given piece of cipher text and a suspected piece of corresponding plaintext to first deduce a so-called "menu."  A menu is simply a graph, which represents the various relationships between cipher text and plaintext letters.  Then the menu was used to program an electrical device called a Bombe.).

44.    *The Development of Public Key Encryption*.  Prior to 1976 (roughly three decades before the patents-in-suit issued), the only method of encryption was use of a symmetric key.  Egyptian Ciphers, Polyalphabetic Encryption, and the Enigma Machine relied on a sender and receiver sharing the same key (a symmetric key).  The advent of computer networks and the increasing computational power of computers spurred the invention of a cryptographic system specifically tailored toward encrypting and decrypting electronic messages communicated using a computer.

45.    In a 1976 paper, cited on the face of the STPC patents, Whitfield Diffie and Martin Hellman proposed the notion of *public-key* (frequently, and more generally, called *asymmetric key*) cryptography in which two different but mathematically related keys are used—a *public* key and a *private* key.  Systems that utilize *public key* encryption were developed specifically to address problems unique to computer networking.  Public key encryption at the time of the invention of the STPC patent technologies was not a long-held view, nor a technology that simply amounted to taking something and "doing it on a computer."  The introduction to Diffie and Hellman's paper makes clear that public key systems were specific to computer networking.

> This paper deals with new problems which arise in the application of cryptography to computer communication systems with large numbers of users. Foremost among these is the key distribution problem. We

Diffie, et al, in *Multiuser Cryptographic Techniques*, AFIPS--Conference Proceedings, Vol. 45 at 109 (1976).

46.    A public key system contains two keys (numbers) so that calculation of one key (the 'private key') is computationally infeasible from the other (the 'public key'), even though they are necessarily related.  Instead, both keys are generated secretly, as an interrelated pair.  Public key encryption offered a novel mechanism for allowing two parties to share data over a network.

47.     The development of Diffie and Hellman's first public key system was directly

motivated by the need to protect stored or transmitted data on a modern computer network.

> In a computer network with a large number of users, cryptography is often essential for protecting stored or transmitted data. While this application closely resembles the age old use of cryptography to protect military and diplomatic communications, there are several important differences which require new protocols and new types of cryptosystems. This paper addresses the multiuser aspect of computer networks and presents ways to preserve privacy of communication despite the large number of user connections which are possible.

*Id.*

48.     The Diffie-Hellman public key system illustrates the limitations present in

systems for encrypting and decrypting information over a computer network contemporaneous to

the STPC patents.  The Diffie-Hellman system lacked the ability to enable the exchange of data

between two parties through an intermediary where the intermediary would not have the ability

to substantially decrypt the data.  A 2005 paper (cited on the face of the STPC patents) described

the limitations of the Diffie-Hellman system when conducting secure third party

communications.  The paper also described a problem that the STPC patents solve as one that

had only recently been addressed:

> It was only recently that the problem has been formally addressed in the three-party model, where the server is considered to be a trusted third party (TTP).  This is the same scenario used in the popular 3-party Kerberos authentication system.  The main advantage of these systems is that users are only required to remember a single password, the one they share with a trusted server, while still being able to establish secure sessions with many users. ***The main drawback is the need of the trusted server during the establishment of these secure sessions.***

Michel Abdalla and David Pointcheval, *Interactive Diffie-Hellman Assumptions With Applications To Password-Based Authentication*, in PROCEEDINGS OF THE 9TH INTERNATIONAL CONFERENCE ON FINANCIAL CRYPTOGRAPHY AND DATA SECURITY (2005) (emphasis added).

49.     Another early encryption system developed for communications over a computer

network is a method of public-key encryption developed by Ron Rivest, Adi Shamir, and

Leonard M. Adleman, now generally referred to as "RSA."  RSA is based on the use of two

19

extremely large prime numbers which fulfill the criteria for a "trap-door, one-way permutation."

Such a permutation function enables the sender to encrypt the message using a non-secret

encryption key, but does not permit an eavesdropper to decrypt the message through crypto-

analytic techniques within an acceptable period of time.  This is because, for a composite number

composed of the product of two very large prime numbers, the computational time necessary to

factor this composite number is unacceptably long.  A brute force attack requires a sequence of

putative keys to be tested to determine which, if any, is appropriate.  A brute force attack

requires a very large number of iterations.  The number of iterations increases exponentially with

the key bit size, while the normal decryption generally suffers only an arithmetic-type increase in

computational complexity.

     50.    Like the Diffie-Hellman system, RSA was developed specifically to address

problems with sending and receiving encrypted information over a computer network.  The

original RSA patent (cited on the face of the STPC and IRI patents) describes the use of public

key encryption as directed toward a computer network.

> With the development of computer technology, the transfer of information in
> digital form has rapidly increased.  There are many applications, including
> electronic mail systems, bank systems and data processing systems, where the
> transferred information must pass over communications channels which may be
> monitored by electronic eavesdroppers.

U.S. Patent No. 4,405,829, col. 1:14-20.

     51.    Academic articles from creators of the RSA system make clear that the use of

public key encryption is specific to problems unique to computer networks.

> [W]e present a sketch of how a computer system might be modified to solve the
> problem of performing operations on encrypted data securely. . . All sensitive data
> in main memory, in the data bank files, in the ordinary register set, and on the
> communications channel will be encrypted.  During operation, a load/store
> instruction between main memory and the secure register set will automatically
> cause the appropriate decryption/encryption operations to be performed.

Ronald L. Rivest, Leonard Adleman, and Michael L. Dertouzos, *On Data Banks and Privacy
Homomorphisms*, IN ON DATA BANKS AND PRIVACY HOMOMORPHISMS 169 (1978).

     52.    The RSA system illustrates limitations in encryption technologies that preceded

the STPC patents.  RSA provided a mechanism for exchanging data between two parties but did

not disclose the use of an untrusted intermediary when data was exchanged between two parties.

20

A 1998 article contemporaneous to the development of the STPC patents (and cited on the face of the STPC patents) describes this as a limitation in the RSA system and other systems known at the time.

> We point out that classic techniques of secret sharing [14] are inadequate in this scenario. Secret sharing requires one to reconstruct the secret at a single location before it can be used, hence introducing a single point of failure. The technique described above of sharing the secret key such that it can be used without reconstruction at a single location is known as *Threshold Cryptography*. See [9] for a succinct survey of these ideas and nontrivial problems associated with them.
>
> An important question left out of the above discussion is key generation. Who generates the RSA modulus $N$ and the shares $d_1, d_2, d_3$? Previously the answer

D. Boneh, J. Horwitz, *Generating A Product Of Three Primes With An Unknown Factorization*, in PROC. OF THE THIRD ALGORITHMIC NUMBER THEORY SYMPOSIUM (ANTS), 237 (1998).

53.     Silvio Micali's patents (U.S. Pat. Nos. 6,026,163 and 5,315,658; cited on the face of the STPC patents) describe a split key, or so-called "fair" cryptosystem, designed to allow a secret key to be distributed to a plurality of trusted entities, such that the encrypted message is protected unless the key portions are divulged by all of the trusted entities.  Thus, a secret key may be recovered through cooperation of a plurality of parties.  The Micali system provides that the decryption key is split between a number (n) of trusted entities, meeting the following functional criteria: (1) The private key can be reconstructed given knowledge of all n of the pieces held by the plurality of trusted entities; (2) The private key cannot be guessed at all if one only knows less than all ($<n-1$) of the special pieces; and (3) For i−1, . . . n, the i[th] special piece can be individually verified to be correct.

54.     The Micali system does not allow communication of a secret in which only one party gains access to the content, and in which the third party or parties and one principal operate only on encrypted or secret information.

**B.     The Value Of The Inventions Disclosed In The STPC Patents**

55.     Executives at leading technology companies have described the value of specific encryption techniques as critical, lasting, and prominent.  Chris Cicotte, a Cloud Architect at EMC, stated strong encryption technologies specific for networked computers "are a vital

component of a strong security posture for any size organization, and it should be a standard offering within the cloud . . . . The threat landscape has already begun to evolve, and from an overall security perspective, we need to take a proactive approach by layering in technologies like encryption at every layer."[19]  The development of secure communications systems and methods, such as the inventions taught in the STPC patents, was motivated by the unique problems created by the internet where secured data is often transmitted through untrusted intermediaries.

> Achieving secure communications in networks has been one of the most important problems in information technology. . . . If there is a private and authenticated channel between two parties, then secure communication between them is guaranteed.  However, in most cases, many parties are only indirectly connected, as elements of an incomplete network of private and authenticated channels.  *In other words they need to use intermediate or internal nodes*.

Yvo Desmedt and Yongee Wang, *Perfectly Secure Message Transmission Revisited* at 502, Advances in Cryptology EUROCRYPT Vol. 2332 (2002) (emphasis added).

56.    Companies such as Oracle Corporation, International Business Machines Corporation, Hewlett-Packard Company, and Google, Inc., confirm the importance of providing strong encryption systems that address the unique threats posed by moving data to the cloud.

> Once data is moved to the cloud, *it becomes vulnerable to a number of new threats* ranging from stolen administrator credentials to new hacking techniques. In addition, new legislation, such as the USA PATRIOT Act, is making it possible for competitors and governments to access data from cloud providers without the consent of the data owner.  Many cloud providers thought they could achieve data sovereignty through locating cloud services in different jurisdictions, but this theory has been shaken by the subpoena classification ruling handed down recently in the U.S. federal court.

*HP Atalla Cloud Encryption: Securing Data in the Cloud*, HP TECHNICAL WHITE PAPER 2 (2014) (emphasis added).

> The need to secure data is driven by an expanding privacy and regulatory environment coupled with an increasingly dangerous world of hackers, insider threats, organized crime, and other groups intent on stealing valuable data.  *The security picture is complicated even more by the rapid expansion of access to sensitive data via the Internet*, an unprecedented understanding of technology, increasing economic competition, and the push to achieve greater efficiencies through consolidation and cloud computing.

---

[19] Jude Chao, *Cloud Computing Demands Cloud Data Encryption*, ENTERPRISE NETWORKING PLANET WEBSITE, May 13, 2014, http://www.enterprisenetworkingplanet.com/netsecur/cloud-computing-demands-cloud-data-encryption.html.

*Oracle Database 12C Security And Compliance*, ORACLE WHITE PAPER 2 (February 2015) (emphasis added).

> With rare exceptions, one of the most important assets for any company is its data. Your data may take the form of financial information, proprietary sales information, marketing information, healthcare information, intellectual property (IP), and more. Losing your data could negatively affect operations and potentially shut down your organization. . . . Cloud-aware applications create unique security challenges in that both Infrastructure as a Service (IaaS) providers and Platform as a Service (PaaS) providers make use of a shared-risk model.

Robi Sen, *Develop Secure Cloud-Aware Applications*, IBM DEVELOPER WORKS 2-3 (May 20, 2015).

> Business requirements, industry regulations, and government mandates increasingly dictate that your organization must secure electronic communications. Whether it is financial data, medical records, or proprietary corporate information, you simply must secure the delivery of sensitive content to its destination.

*Google Message Encryption*, GOOGLE APPLICATION SECURITY PAPER 1 (2008)

57.    Numerous academics have concluded the advent of cloud computing has created challenges that are unique to cloud computing and these challenges require specific encryption technologies that were previously unnecessary.

> The growing demand for cloud computing stems from the need to securely store, manage, share and analyze immense amounts of complex data in many areas, including health care, national security and alternative energy. And although several companies have launched commercially available cloud systems, two areas still need significant improvements, [Dr. Bhavani] Thuraisingham said: the security mechanisms needed to protect sensitive data as well as the capability to process huge amounts of both geospatial data and what's known as semantic Web data.

*Investment in Cloud Computing Research Pays Off, UT Dallas Computer Scientists Make Advances in Key Aspects of Growing Field*, UNIVERSITY OF TEXAS AT DALLAS NEWS CENTER (April 19, 2011).[20]

---

[20] *See also* Kevin Hamlen et al., *Security Issues For Cloud Computing* at 39, INTERNATIONAL JOURNAL OF INFORMATION SECURITY AND PRIVACY Vol. 4(2) (April-June 2010) ("Because of the critical nature of the applications, it is important that clouds be secure. The major security challenge with clouds is that the owner of the data may not have control of where the data is placed."); Ryan Layfield, Murat Kantarcioglu, and Bhavani Thuraisingham, *Enforcing Honesty in Assured Information Sharing within a Distributed System*, IFIP WG 11.3 CONFERENCE ON DATABASE AND APPLICATIONS SECURITY (2007) ("The growing number of distributed information systems such as the internet has created a need for security in data sharing."); Safwan M. Khan and Kevin W. Hamlen, *AnonymousCloud: A Data Ownership Privacy Provider Framework in Cloud Computing* at 170, in PROCEEDINGS OF THE 11TH IEEE INTERNATIONAL CONFERENCE ON TRUST, SECURITY AND PRIVACY IN COMPUTING AND COMMUNICATIONS (June 2012) ("Revolutionary advances in hardware, middleware, and virtual machines over the past few years have elevated cloud computing to a thriving industry . . . . A significant barrier to the adoption of cloud services is customer fear of privacy loss in the cloud.").

> Security is the most important challenge for cloud technology, as CSP's [Cloud Service Providers] have to protect the consumer's data from theft and ensure the consumer is not exploited. Consumers may be exploited from denial of service (DoS) attacks . . . ***They must also protect the data through the use of advanced encryption algorithms*** and ensure that their data centers are physically secure using advanced biometrics and many other authentication methods.

Sean Carlin & Kevin Curran, *Cloud Computing Technologies*, in INTERNATIONAL JOURNAL OF CLOUD COMPUTING AND SERVICES SCIENCE (IJ-CLOSER) Vol.1, No.2 at 59 (June 2012) (emphasis added).

> The growth of computer networks and the opening that their interconnection brings, especially through Internet, mean that a great amount of information is traveling through network and ***crossing numerous intermediate systems. This results in the increase of the number of possible attacks and illegal operations***. . . . They should guarantee the identity of the communicating parties . . . the protection against unauthorized writing and, in some cases, unauthorized reading of transferred data. These services of authentication, nonrepudiation, integrity and confidentiality, respectively, can be provided using cryptosystems.

Natasha Prohic, *Public Key Infrastructures - PGP vs. X.509* at 1, in INFOTECH SEMINAR ADVANCED COMMUNICATION SERVICES (ACS) (2005) (emphasis added).

58.     On information and belief, contemporaneous to, and following conception of the inventions disclosed in the STPC patents, academics, and businesses headquartered in Texas actively entered the field of secure encrypted communications.  Computer researchers at the University of Texas at Austin founded the Security Research Group.  The University of Texas at Dallas founded the Data Security and Privacy Lab, a center for research on security issues raised by dissemination of data over computer networks.

59.     Texas based companies incorporated secure communications technologies into numerous products and many of these same companies cite STPC patents in their own patents. Texas based businesses that developed products incorporating secure communications technologies included: HP Enterprise Services, LLC of Plano, Texas; Texas Instruments, Inc. of Dallas, Texas; Rocksteady Technologies, LLC of Austin, Texas; Dell, Inc. of Round Rock, Texas; AT&T Intellectual Property whose inventors were based in various locations in Texas; Net.Orange, Inc. of Dallas, Texas; Futurewei Technologies, Inc. of Plano, Texas, etc..  The STPC patents are cited by at least 50 patents that were either initially assigned to or are currently assigned to entities headquartered in Texas.

       **1.     U.S. Patent No. 8,316,237**

60.     U.S. Patent No. 8,316,237 (the "237 patent") entitled, System and Method for Secure Three-Party Communications, was filed on January 10, 2011 and claims priority to March 23, 2001.  St. Luke is the owner by assignment of the '237 patent.  A true and correct copy of the '237 patent is attached hereto as Exhibit A.  The '237 patent claims specific methods and systems for securely transcrypting protected electronic information transmitted over at least one computer network from a first encrypted form to a second, different encrypted form substantially without intermediate decryption of the protected electronic information.

61.     The '237 patent has been cited by over 200 issued United States patents and published patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '237 patent as relevant prior art.

- Electronics and Telecommunications Research Institute (ETRI)
- NEC Corporation
- Disney Enterprises, Inc.
- WMS Gaming, Inc.
- Verizon Patent and Licensing, Inc.
- Microsoft Corporation.
- Netapp. Inc.
- NCR Corporation
- EMC Corporation
- AT&T Intellectual Property, L.P.
- Sony Corporation
- SAP AG
- Blackberry Limited
- Adobe Systems Incorporated
- Nippon Telegraph and Telephone Corporation
- Novell, Inc.
- Spring Communications L.P.
- Hytrust, Inc.
- International Business Machines Corporation
- Google. Inc.
- Kabushiki Kaisha Toshiba
- Panasonic Intellectual Property Management Co., Ltd.
- Zynga Inc.
- Certicom Corp.
- Wincor Nixdorf International Gmbh
- Oracle International Corporation
- Futurewei Technologies, Inc.
- Dell Products, L.P.
- Intuit Inc.

62.     The '237 patent claims a technical solution to a problem unique to computer networks – securely transmitting encrypted electronic information via an intermediary device,

wherein the electronic information is cryptographically secure not only from outside attackers, but also from the intermediary.

63.     At the time of the inventions claimed in the '237 patent, securely processing, transmitting, and accessing protected electronic data in a massively distributed computing environment presented new and unique issues over the state of the art.  As explained in the '237 patent: "Often, the nature of these communications protocols places the third party (or group of third parties) in a position of trust, meaning that the third party or parties, without access to additional information, can gain access to private communications or otherwise undermine transactional security or privacy."  '237 patent, col. 2:13-17.

> Generating and protecting encryption keys while maintaining data availability has traditionally been a major barrier to implementing encryption, especially on an enterprise scale.  Key management is complex and challenging, and often fails because issuance, storage, and renewing are difficult.  **Worse yet, lost keys can make important data permanently unrecoverable**.

*Sustainable Compliance for the Payment Card Industry Data Security Standard*, ORACLE WHITE PAPER 23 (July 2015) (emphasis added).

64.     Although the systems and methods taught in the '237 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '237 patent claims were innovative and novel.  "Typical public key encryption technologies, however, presume that a pair of communications partners seek to communicate directly between each other, without the optional or mandatory participation of a third party, and, in fact, are designed specifically to exclude third party monitoring."  '237 patent, col. 2:56-61.  Indeed, companies such as Oracle have recognized that, until recently, security for distributed systems was not a primary concern.

- **Security was not a major issue, even for Oracle**
  - Standard passwords (scott/tiger, system/manager, ...)
  - Oracle standard users were installed and left open (though not at SAP!)
  - There are some recommendations, but not much more.
  - From Oracle9i, the issue of security was increasingly addressed by Oracle (DBCA: locking of default accounts,..., 10.2: CONNECT roles)

Andreas Becker, *High Security for SAP Data with Oracle Database Vault and Transparent Data Encryption*, ORACLE PRESENTATION 6 (2010).

      65.     Further, the '237 patent claims improve upon the functioning of a computer system by allowing encrypted electronic data to be securely transmitted through an intermediary without the intermediary gaining substantial access to the unencrypted information.  This improves the security of the computer system and allows it to be more efficient.[21]  "Third parties, however, may offer valuable services to the participants in a communication, but existing protocols for involvement of more than two parties are either inefficient or insecure."  '237 patent, col. 2:61-64.  Studies have confirmed that the inventions disclosed in the '237 patent improve the security of systems.

> ***Key management is a big concern with encryption, because the effectiveness of the solution ultimately depends on protecting the key***.  If the key is exposed, the data being protected with the key is, essentially, exposed.  Wherever the key is stored, it must be protected, and it should be changed on occasion.  For example, if an administrator with access to a key leaves an organization, the key should be changed.

Tanya Baccam, *Transparent Data Encryption: New Technologies and Best Practices for Database Encryption*, SANS WHITE PAPER 3 (April 2010) (emphasis added).

---

[21] *See* Kevin Hamlen et al., *Security Issues For Cloud Computing* at 39, INTERNATIONAL JOURNAL OF INFORMATION SECURITY AND PRIVACY VOL. 4(2) (April-June 2010) ("The major security challenge with clouds is that the owner of the data may not have control of where the data is placed. . . . Therefore, we need to safeguard the data in the midst of untrusted processes."); Elana Ferrari and Bhavani Thuraisingham, *Security and Privacy for Web Databases and Services* at 17, PROCEEDINGS OF THE EDBT CONFERENCE (March 2003) ("very little work has been devoted to security"); Elisa Bertino et al.; *Selective and Authentic Third-Party Distribution of XML Documents* at 1263, IEEE TRANSACTIONS ON KNOWLEDGE AND DATA ENGINEERING, Vol. 16 No. 10 (October 2004) ("The most intuitive solution is that of requiring Publishers to be trusted with regard to the considered security properties.  However, this solution could not always be feasible in the Web environment since large Web-based systems cannot be easily verified to be secure.").

66.     The '237 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," or "a building block of the modern economy."  Instead, they are limited to a concretely circumscribed set of methods and systems for transcrypting electronic information that is transmitted over a computer network via an intermediary.

67.     The '237 patent claims are not directed at the broad concept/idea of "encrypting" or "decrypting" information.  Instead, they are limited to a concretely circumscribed set of methods and systems for transcrypting electronic information that is transmitted over a computer network via an intermediary.  These methods and systems are technologies unique to the Internet age.

68.     The inventive concepts claimed in the '237 patent are technological, not "entrepreneurial."  For example, transcrypting protected electronic information between a first (e.g., server) encrypted form and a second (e.g., network) encrypted form without a substantial intermediate representation of the information in decrypted form is a specific, concrete solution to the technological problem of transferring encrypted information via an intermediary without providing the intermediary substantial access to the information.

69.     Researchers have identified the problems the '237 patent is directed at solving arise from new security challenges relating to cloud computing.

> **Data Security:** Data security was the most important concern that had hindered the acceptance of the cloud computing initially. Storing and processing the data, running software, using CPU and virtual Machines on others' infrastructure were some serious concerns for the users initially. Data breach, data integrity and data loss are major security issues that posed threats to organization's data and software. Moreover, the multi-tenancy model and pooled computing resources over cloud have introduced new security challenges requiring new techniques to tackle with [4] [5] [6].

Deepak Panth, Dhananjay Mehta and Rituparna Shelgaonkar, *A Survey on Security Mechanisms of Leading Cloud Service Providers*, in INTERNATIONAL JOURNAL OF COMPUTER APPLICATIONS 98(1) at 34 (July 2014) (emphasis added).[22]

70.    The '237 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of secure distributed computing.  For example, claims of the '237 patent require transcrypting protected electronic information using one or more intermediary computing devices specially configured to yield a desired result—a result that overrides the routine and conventional sequence of events in electronic communications, even encrypted electronic communications.

71.    The '237 patent is directed to specific problems in the field of cryptography.  In the "Background" section of the patent, the '237 patent explains that encryption systems use "keys," similar to passwords, to control how plaintext is encrypted and decrypted.  '237 patent, col. 2:65–3:13.  An encryption system thereby encrypts and decrypts information differently depending upon the key input.  *Id*.  Two common cryptanalytic attacks, linear and differential cryptanalysis, analyze large amounts of ciphertext (encrypted information) and different possible keys in order to eventually converge on the correct key and break the encryption.  *Id*. at col. 3:1– 3:13.  Both attacks exploit the fact that some encryption systems use static keys to create the

---

[22] *See also* Vaibhav Khadilkar, Murat Kantarcioglu, and Bhavani Thuraisingham, *Secure Data Processing in a Hybrid Cloud* at 1-2, Computing Research Repository (CoRR) abs/1105.1982 (2011) ("The emergence of cloud computing has created a paradigm shift by allowing parallel processing of massive amounts of data. . . . [H]ow do users protect themselves from cloud service providers who may be able to access their data?  This issue is related to data security and is relevant for users since their data is placed at the provider's site.").

ciphertext.  *Id*.  In other words, using the same key over and over gives an attacker more information to work with.  The inventions of the '237 patent introduce several novel techniques to overcome these weaknesses and allow encrypted information to be securely transferred through an intermediary.

72.     The preemptive effect of the claims of the '237 patent are concretely circumscribed by specific limitations.  For example, claim 1 of the '237 patent requires:

A transcryption device, comprising:

an automated communication port configured to receive a first message representing an encrypted communication associated with a first set of asymmetric keys, to receive a transcryption key, and to transmit a second message representing the encrypted communication associated with a second set of asymmetric keys, the first and second sets of encryption keys being distinct;

a memory; and

an automated processor, configured to communicate through the automated communication port and with the memory, to receive the first message, receive the transcryption key, automatically transcrypt the first message into the second message, and to transmit the second message, wherein the automated processor does not store as a part of the transcryption any decrypted representation of the encrypted communication, and the transcryption key is employed without revealing any secret cryptographic information usable for decrypting the first message or the second message.

73.     The '237 patent does not attempt to preempt every application of the idea of encrypting electronic information transmitted over a computer network, or even the idea of encrypting electronic information transmitted over a computer network via an intermediary.

74.     The '237 patent does not preempt the field of secure third-party communications systems, or prevent use of alternative secure third-party communications systems.  For example, the '237 patent includes inventive elements—embodied in specific claim limitations—that concretely circumscribe the patented invention and greatly limit its breadth.  These inventive

elements are not necessary or obvious tools for achieving secure third-party communications, and they ensure that the claims do not preempt other techniques for secure communications.

75.    For example, the '237 patent describes numerous techniques for secure third-party communications that inform the invention's development but do not, standing alone, fall within the scope of its claims:

- Key Escrow.  U.S. Pat. No. 6,009,177 to Sudia, relates to a cryptographic system and method with a key escrow feature that uses a method for verifiably splitting users' private encryption keys into components and for sending those components to trusted agents chosen by the particular users.

- Partitioning of Information Storage Systems.  U.S. Patent No. 5,956,400 to Chaum, relates to partitioned information storage systems with controlled retrieval.

- Use of a Trusted Intermediary.  U.S. Patent No. 6,161,181 to Haynes, describing secure electronic transactions using a trusted Intermediary; U.S. Patent No. 6,145,079 to Misty, describing secure electronic transactions using a trusted intermediary to perform electronic services.

- Split Key Storage.  U.S. Patent No. 6,118,874 to Okamoto, teaching encrypted data using split storage key and system.

- Use of a Cryptographic File Labeling System.  U.S. Pat. No. 5,953,419 to Lohstroh, disclosing cryptographic file labeling system for supporting secured access by multiple users.

- Computer Security Devices. U.S. Pat. No. 5,982,520 to Weiser, disclosing a personal storage device for receipt, storage, and transfer of digital information to other electronic devices; *see also* U.S. Pat. No. 5,991,519 to Benhammou; U.S. Pat. No. 5,999,629 to Heer; and U.S. Pat. No. 6,034,618 to Tatebayashi.

- Computer Network Firewalls And Agents.  U.S. Pat. No. 6,061,798 to Coley, disclosed the use of an assigned proxy agent to verify the authority of an incoming request to access a network element indicated in the request.  Once verified, the proxy agent completes the connection to the protected network element on behalf of the source of the incoming request; *see also* U.S. Pat. No. 6,023,762 to Dean, disclosing a data access and retrieval system which comprises a plurality of user data sources each storing electronic data signals describing data specific to a user, or enabling services selected by a user; an agent device which is configurable to select individual ones of the user data sources and

present selections of user data and service data to a set of callers who may interrogate the agent device remotely over a communications network; and U.S. Pat. No. 6,029,150 to Kravitz, disclosing a system and method of payment in an electronic payment system wherein a plurality of customers have accounts with an agent.  Further, the patent lists thirty-three other patented systems involving Computer Network Firewalls that are not, standing alone, preempted by the inventions claimed in the patents-in-suit.

- Virtual Private Networks.  As described in: U.S. Pat. No. 6,079,020 to Liu and U.S. Pat. No. 6,081,900 and twenty other patented systems involving virtual private networks that are not, standing alone, preempted by the inventions claimed in the patents-in-suit.

- Biometric Authentication.  U.S. Pat. No. 5,193,855 to Shamos, disclosing the use of biometrics such as fingerprints to facilitate secure communications and identification of users.  Further, the '237 lists 238 patented systems that use biometric authentication that are not, standing alone, preempted by the inventions claimed in the patents-in-suit.

76.     Although "[e]ncryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years,"[23] the '237 patent does not claim, or attempt to preempt, "some process that involves the encryption of data for some purpose" (or similar abstraction).

77.     The '237 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the Internet or using a conventional computer.

78.     The claimed subject matter of the '237 patent is not a pre-existing but undiscovered algorithm.

79.     The '237 patent claims systems and methods that "could not conceivably be performed in the human mind or pencil and paper."[24]

---

[23] *Paone v. Broadcom Corp.,* Case No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279, at *7 (E.D.N.Y. Aug. 19, 2015) (*citing Fid. Nat'l Info. Servs., Inc.,* Petitioner, CBM2014-00021, 2015 WL 1967328, at *8 (Apr. 29, 2015) (both upholding the patent eligibility of patents directed toward encryption).

[24] *TQP Dev., LLC v. Intuit Inc.*, Case No. 2:12-CV-180-WCB, 2014 WL 651935, at *4 (E.D. Tex. Feb. 19, 2014) (finding claims directed to encryption to be patent eligible); *Paone v. Broadcom Corp.,* Case No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279, at *7 (E.D.N.Y. Aug. 19, 2015); *see also Prism Technologies, LLC v. T-Mobile USA, Inc.*, 12-cv-124, Dkt. No. 428 at 7 (D. Neb. Sept. 22, 2015) (Finding on cross motions for summary judgment that patents directed at delivering resources over an untrusted network were patent eligible.  "The problems addressed by Prism's claims are ones that 'arose uniquely in the context of the Internet.'").

80.     The '237 patent claims require the use of a computer system.

81.     The claims in the '237 patent require the modifying of data that has concrete and valuable effects in the field of secure third-party communications.  By allowing an intermediary to receive secure information but not gain access to the unencrypted form of the information, the '237 patent improves the security of computer systems.  Prior art systems that the '237 patent remedies enabled unauthorized "access to private communications or otherwise undermine[d] transactional security or privacy."  Companies have described the use of encryption in the cloud as important to improve the security and functioning of systems.

> For many organizations, keeping data private and secure has also become a compliance requirement.  Standards including Health Insurance Portability and Accountability Act of 1996 (HIPAA), Sarbanes-Oxley (SOX), Payment Card Industry Data Security Standard (PCI DSS), the Gramm-Leach-Bliley Act, and EU Data Protection Directives all *require that organizations protect their data at rest and provide defenses against threats*.

HP ATALLA CLOUD ENCRYPTION: SECURING DATA IN THE CLOUD, HP TECHNICAL WHITE PAPER 2 (2014).

82.     The '237 patent claims systems and methods not merely for transferring secure information over a computer network, but for making the computer network itself more secure. [25]

83.     The claimed invention in the '237 claims is rooted in computer technology and overcomes problems specifically arising in the realm of computer networks.

84.     The systems and methods claimed in the '237 patent were not a longstanding or fundamental economic practice at the time of the patented inventions.  Nor were they fundamental principles in ubiquitous use on the Internet or computers in general.  As just one

---

[25] Limitations in the prior art that the '237 patent was directed to solving included: computer systems where a "third party plays a requisite role in the transaction but which need not be trusted with access to the information or the cryptographic key" (*Id.*, col. 2:5-7); "[p]asswords may be written near access terminals (*Id.* col. 1:50-51);" "[s]ecurity tokens can be stolen or misplaced" (*Id.*, col. 1:51-52); "users may share supposedly secret information" (*Id.*, col. 1:52); and "unauthorized uses of the system" (*Id.*, col. 11:28).  The '237 patent "allows the entity that transmits the information to be assured that the transmission will be secure, even with respect to a trusted third party, while ensuring that the intended recipient must cooperate with the intended third party."  '237 patent, col. 8:48-52.

example, at the time the inventions disclosed in the '237 patent were conceived, the use of

asymmetric encryption keys was described by Oracle as "relatively new."[26]

> A Public Key Infrastructure (PKI) consists of protocols, services, and standards supporting applications of public key cryptography. ***Because the technology is still relatively new***, the term PKI is somewhat loosely defined.

INTRODUCTION TO THE SSL TECHNOLOGY, ORACLE DOCUMENTATION (February 1, 2001), http://docs.oracle.com/cd/E53645_01/tuxedo/docs12cr2/security/publickey.html

85.     The asserted claims do not involve a method of doing business that happens to be

implemented on a computer; instead, the '237 patent teaches changing data in a way that will

affect the communication system itself, by making it more secure.  The security challenges that

the '237 patent is directed at overcoming were new and unique to distributed networks, as

confirmed in a recent paper from Accenture Services Pvt. Ltd.:  "The unprecedented growth of

cloud computing has created new security challenges.  The problem is ever more complex as

there is a transition from traditional computing to a service-based computing."[27]

86.     The '237 patent claims are not directed at a mathematical relationship or formula.

The '237 patent claims concrete, specific computer systems and methods for cryptographically

protecting and managing access to secure data in multi-party communications.

87.     '237 patent claims transform data from one form into another that will be

recognizable by the intended recipient but secure against decryption by unintended recipients.

88.     IBM in its computer reference guides ("redbooks"), refers to encryption as

"transform[ing] data that is unprotected.

---

[26] *See also* BACKUPEDGE ENCRYPTION WHITEPAPER, MICROLITE CORPORATION at 2 (2003) (describing the technology of asymmetric keys as "new"); Roger Clarke, MESSAGE TRANSMISSION SECURITY (May 1998), http://www.rogerclarke.com/II/CryptoSecy.html ("Public key cryptography is relatively new and technically complex.").

[27] Deepak Panth, Dhananjay Mehta and Rituparna Shelgaonkar, *A Survey on Security Mechanisms of Leading Cloud Service Providers*, in INTERNATIONAL JOURNAL OF COMPUTER APPLICATIONS 98(1) at 34 (July 2014).



**Encryption concepts and terminology**

Encryption transforms data that is unprotected, or *plain text*, into encrypted data, or *ciphertext*, by using a *key*. Without knowledge of the encryption key, the ciphertext cannot be converted back to plain text.

*Bertrand Dufrasne and Robert Tondini*, IBM DS8870 DISK ENCRYPTION 6th Edition at 4 (2015) (From a reference guide published by IBM.)

89.      One or more claims of the '237 patent require a specific configuration of electronic devices, a network configuration, and the use of encryption systems to secure communications from access by an intermediary.  These are meaningful limitations that tie the claimed methods and systems to specific machines.  For example, the below diagram from the '237 patent illustrates a specific configuration of hardware disclosed in the patent.

'237 patent, Fig. 1.

###     2.      U.S. Patent No. 8,904,181

90.      U.S. Patent No. 8,904,181 (the "'181 patent") entitled, System and Method for Secure Three-Party Communications was filed on November 20, 2012 and claims priority to March 23, 2001.  St. Luke is the owner by assignment of the '181 patent.  A true and correct

copy of the '181 patent is attached hereto as Exhibit B.  The '181 patent claims specific methods and systems for securely transcrypting protected electronic information transmitted over at least one computer network from a first encrypted form to a second, different encrypted form substantially without intermediate decryption of the protected electronic information.

91.     The '181 patent claims a technical solution to a problem unique to computer networks – securely transmitting encrypted electronic information via an intermediary device, wherein the electronic information is cryptographically secure not only from outside attackers, but also from the intermediary.

92.     At the time of the inventions claimed in the '181 patent, securely processing, transmitting, and accessing protected electronic data in a massively distributed computing environment presented new and unique issues over the state of the art.  As explained in the '181 patent: "Often, the nature of these communications protocols places the third party (or group of third parties) in a position of trust, meaning that the third party or parties, without access to additional information, can gain access to private communications or otherwise undermine transactional security or privacy."  '181 patent, col. 2:14-20.

> Generating and protecting encryption keys while maintaining data availability has traditionally been a major barrier to implementing encryption, especially on an enterprise scale.  Key management is complex and challenging, and often fails because issuance, storage, and renewing are difficult.  ***Worst yet, lost keys can make important data permanently unrecoverable***.

*Sustainable Compliance for the Payment Card Industry Data Security Standard*, ORACLE WHITE PAPER 23 (July 2015) (emphasis added).

93.     Although the systems and methods taught in the '181 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '181 patent claims were innovative and novel.  "Typical public key encryption technologies, however, presume that a pair of communications partners seek to communicate directly between each other, without the optional or mandatory participation of a third party, and, in fact, are designed specifically to exclude third party monitoring."  '181 patent, col. 2:59-64.  Indeed, companies such as Oracle have recognized that, until recently, security for distributed systems was not a

primary concern.



Andreas Becker, *High Security for SAP Data with Oracle Database Vault and Transparent Data Encryption*, ORACLE PRESENTATION 6 (2010).

94.     Further, the '181 patent claims improve upon the functioning of a computer system by allowing encrypted electronic data to be securely transmitted through an intermediary without the intermediary gaining substantial access to the unencrypted information.  This improves the security of the computer system and allows it to be more efficient.  "Third parties, however, may offer valuable services to the participants in a communication, but existing protocols for involvement of more than two parties are either inefficient or insecure."  '181 patent, col. 2:64-67.  Studies have confirmed that the inventions disclosed in the '181 patent improve the security of systems.

> ***Key management is a big concern with encryption, because the effectiveness of the solution ultimately depends on protecting the key***.  If the key is exposed, the data being protected with the key is, essentially, exposed.  Wherever the key is stored, it must be protected, and it should be changed on occasion.  For example, if an administrator with access to a key leaves an organization, the key should be changed.

Tanya Baccam, *Transparent Data Encryption: New Technologies and Best Practices for Database Encryption*, SANS WHITE PAPER 3 (April 2010) (emphasis added).

95.     The '181 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," or "a building block of the modern economy."  Instead, they are limited to a concretely circumscribed set of methods and systems for transcrypting electronic information that is transmitted over a computer network via an intermediary.

96.     The '181 patent claims are not directed at the broad concept/idea of "encrypting" or "decrypting" information.  Instead, they are limited to a concretely circumscribed set of methods and systems for transcrypting electronic information that is transmitted over a computer network via an intermediary.  These methods and systems are technologies unique to the Internet age.

97.     The inventive concepts claimed in the '181 patent are technological, not "entrepreneurial."  For example, transcrypting protected electronic information between a first (e.g., server) encrypted form and a second (e.g., network) encrypted form without a substantial intermediate representation of the information in decrypted form is a specific, concrete solution to the technological problem of transferring encrypted information via an intermediary without providing the intermediary access to the information.

98.     Researchers have identified the problems the '181 patent is directed at solving arise from new security challenges relating to cloud computing.

> **Data Security:** Data security was the most important concern that had hindered the acceptance of the cloud computing initially. Storing and processing the data, running software, using CPU and virtual Machines on others' infrastructure were some serious concerns for the users initially. Data breach, data integrity and data loss are major security issues that posed threats to organization's data and software. Moreover, the multi-tenancy model and pooled computing resources over cloud have introduced new security challenges requiring new techniques to tackle with [4] [5] [6].

Deepak Panth, Dhananjay Mehta and Rituparna Shelgaonkar, *A Survey on Security Mechanisms of Leading Cloud Service Providers*, in INTERNATIONAL JOURNAL OF COMPUTER APPLICATIONS 98(1) at 34 (July 2014) (emphasis added).

99.     The '181 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of secure distributed computing.  For example, claims of the '181 patent require transcrypting protected electronic information using one or more intermediary computing devices specially configured to yield a desired result—a result that

overrides the routine and conventional sequence of events in electronic communications, even encrypted electronic communications.

100.    The '181 patent is directed to specific problems in the field of cryptography.  In the "Background" section of the patent, the '181 patent explains that encryption systems use "keys," similar to passwords, to control how plaintext is encrypted and decrypted.  '181 patent, col. 2:11–5:8.  An encryption system thereby encrypts and decrypts information differently depending upon the key input.  *Id.*  Two common cryptanalytic attacks, linear and differential cryptanalysis, analyze large amounts of ciphertext (encrypted information) and different possible keys in order to eventually converge on the correct key and break the encryption.  *Id.* at col. 4:10–4:27.

101.    Both attacks exploit the fact that some encryption systems use static keys to create the ciphertext.  *Id.*  In other words, using the same key over and over gives an attacker more information to work with.  The inventions of the '181 patent introduce several novel techniques to overcome these weaknesses and allow encrypted information to be securely transferred through an intermediary.

102.    The preemptive effect of the claims of the '181 patent are concretely circumscribed by specific limitations.  For example, claim 1 of the '181 patent requires:

A key handler, comprising:

an interface to a memory which stores a plurality of encrypted records, each encrypted record having an associated asymmetric encryption key pair and being encrypted with a first component of the associated asymmetric encryption key pair;

at least one automated processor operating in a privileged processing environment, configured to receive a selected encrypted record from the memory through the interface, to negotiate at least one asymmetric session key, and to transcrypt the encrypted message to a transcrypted message in an integral process substantially without intermediate decryption, using a transcryption key derived at least in part from the at least one asymmetric session key; and

a communication port configured to conduct the negotiation for the at least one asymmetric session key and to communicate the transcrypted record.

103.    The '181 patent does not attempt to preempt every application of the idea of encrypting electronic information transmitted over a computer network, or even the idea of encrypting electronic information transmitted over a computer network via an intermediary.

104.    The '181 patent does not preempt the field of secure third-party communications systems, or prevent use of alternative secure third-party communications systems.  For example, the '181 patent includes inventive elements—embodied in specific claim limitations—that concretely circumscribe the patented invention and greatly limit its breadth.  These inventive elements are not necessary or obvious tools for achieving secure third-party communications, and they ensure that the claims do not preempt other techniques for secure communications.

105.    For example, the '181 patent describes numerous techniques for secure third-party communications that inform the invention's development but do not, standing alone, fall within the scope of its claims:

- Key Escrow.  U.S. Pat. No. 6,009,177 to Sudia, relates to a cryptographic system and method with a key escrow feature that uses a method for verifiably splitting users' private encryption keys into components and for sending those components to trusted agents chosen by the particular users.

- Partitioning of Information Storage Systems.  U.S. Patent No. 5,956,400 to Chaum, relates to partitioned information storage systems with controlled retrieval.

- Use of a Trusted Intermediary.  U.S. Patent No. 6,161,181 to Haynes, describing secure electronic transactions using a trusted Intermediary; U.S. Patent No. 6,145,079 to Misty, describing secure electronic transactions using a trusted intermediary to perform electronic services.

- Split Key Storage.  U.S. Patent No. 6,118,874 to Okamoto, teaching encrypted data using split storage key and system.

- Use of a Cryptographic File Labeling System.  U.S. Pat. No. 5,953,419 to Lohstroh, disclosing cryptographic file labeling system for supporting secured access by multiple users.

- Computer Security Devices. U.S. Pat. No. 5,982,520 to Weiser, disclosing a personal storage device for receipt, storage, and transfer of digital information to other electronic devices; *see also* U.S. Pat. No. 5,991,519 to Benhammou; U.S. Pat. No. 5,999,629 to Heer; and U.S. Pat. No. 6,034,618 to Tatebayashi.

- Computer Network Firewalls And Agents. U.S. Pat. No. 6,061,798 to Coley, disclosed the use of an assigned proxy agent to verify the authority of an incoming request to access a network element indicated in the request. Once verified, the proxy agent completes the connection to the protected network element on behalf of the source of the incoming request; *see also* U.S. Pat. No. 6,023,762 to Dean, disclosing a data access and retrieval system which comprises a plurality of user data sources each storing electronic data signals describing data specific to a user, or enabling services selected by a user; an agent device which is configurable to select individual ones of the user data sources and present selections of user data and service data to a set of callers who may interrogate the agent device remotely over a communications network; and U.S. Pat. No. 6,029,150 to Kravitz, disclosing a system and method of payment in an electronic payment system wherein a plurality of customers have accounts with an agent. Further, the patent lists thirty-three other patented systems involving Computer Network Firewalls that are not, standing alone, preempted by the inventions claimed in the patents-in-suit.

- Virtual Private Networks. As described in: U.S. Pat. No. 6,079,020 to Liu and U.S. Pat. No. 6,081,900 and twenty other patented systems involving virtual private networks that are not, standing alone, preempted by the inventions claimed in the patents-in-suit.

- Biometric Authentication. U.S. Pat. No. 5,193,855 to Shamos, disclosing the use of biometrics such as fingerprints to facilitate secure communications and identification of users. Further, the '181 patent lists hundreds of patented systems that use biometric authentication that are not, standing alone, preempted by the inventions claimed in the patents-in-suit.

106. Although "[e]ncryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years,"[28] the '181 patent does not claim, or attempt to preempt, "some process that involves the encryption of data for some purpose" (or similar abstraction).

---

[28] *Paone v. Broadcom Corp.*, No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279, at *7 (E.D.N.Y. Aug. 19, 2015) (*citing* Fid. Nat'l Info. Servs., Inc., Petitioner, CBM2014-00021, 2015 WL 1967328, at *8 (Apr. 29, 2015) (both upholding the patent eligibility of patents directed toward encryption).

107.    The '181 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the Internet or using a conventional computer.

108.    The claimed subject matter of the '181 patent is not a pre-existing but undiscovered algorithm.

109.    The '181 patent claims systems and methods that "could not conceivably be performed in the human mind or pencil and paper."[29]

110.    The '181 patent claims require the use of a computer system.

111.    The claims in the '181 patent require the modifying of data that has concrete and valuable effects in the field of secure third-party communications.  By allowing an intermediary to receive secure information but not gain access to the unencrypted form of the information, the '181 patent improves the security of computer systems.  Prior art systems that the '181 patent remedies enabled unauthorized "access to private communications or otherwise undermine[d] transactional security or privacy."  Companies have described the use of encryption in the cloud as important to improve the security and functioning of systems.

> For many organizations, keeping data private and secure has also become a compliance requirement.  Standards including Health Insurance Portability and Accountability Act of 1996 (HIPAA), Sarbanes-Oxley (SOX), Payment Card Industry Data Security Standard (PCI DSS), the Gramm-Leach-Bliley Act, and EU Data Protection Directives all *require that organizations protect their data at rest and provide defenses against threats*.

HP ATALLA CLOUD ENCRYPTION: SECURING DATA IN THE CLOUD, HP TECHNICAL WHITE PAPER 2 (2014).

112.    The '181 patent claims systems and methods not merely for transferring secure information over a computer network, but for making the computer network itself more secure. [30]

---

[29] *TQP Dev., LLC v. Intuit Inc.*, No. 2:12-CV-180-WCB, 2014 WL 651935, at *4 (E.D. Tex. Feb. 19, 2014) (finding claims directed to encryption to be patent eligible).  *See also Paone v. Broadcom Corp.,* No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279, at *7 (E.D.N.Y. Aug. 19, 2015).

[30] Limitations in the prior art that the '181 patent was directed to solving included: computer systems where a "third party plays a requisite role in the transaction but which need not be trusted with access to the information or the cryptographic key" (*Id.*, col. 2:6-9); "[p]asswords may be written near access terminals (*Id.* col. 1:52-54);" "[s]ecurity tokens can be stolen or

113.     The claimed invention in the '181 claims is rooted in computer technology and overcomes problems specifically arising in the realm of computer networks.

114.     The systems and methods claimed in the '181 patent were not a longstanding or fundamental economic practice at the time of patented inventions.  Nor were they fundamental principles in ubiquitous use on the Internet or computers in general.  As just one example, at the time the inventions disclosed in the '181 patent were conceived, the use of asymmetric encryption keys was described by Oracle as "relatively new."[31]

> A Public Key Infrastructure (PKI) consists of protocols, services, and standards supporting applications of public key cryptography.  ***Because the technology is still relatively new***, the term PKI is somewhat loosely defined.

INTRODUCTION TO THE SSL TECHNOLOGY, ORACLE DOCUMENTATION (February 1, 2001), http://docs.oracle.com/cd/E53645_01/tuxedo/docs12cr2/security/publickey.html

115.     The asserted claims do not involve a method of doing business that happens to be implemented on a computer; instead, it involves a method for changing data in a way that will affect the communication system itself, by making it more secure.  The security challenges that the '181 patent is directed at overcoming were new and unique to distributed networks, as confirmed in a recent paper from Accenture Services Pvt. Ltd.:  "The unprecedented growth of cloud computing has created new security challenges.  The problem is ever more complex as there is a transition from traditional computing to a service-based computing."[32]

116.     The '181 patent claims are not directed at a mathematical relationship or formula. The '237 patent claims concrete, specific computer systems and methods for cryptographically protecting and managing access to secure data in multi-party communications.

---

misplaced" (*Id.*, col. 1:54-55); and "users may share supposedly secret information" (*Id.*, col. 1:55).

[31] *See also* BACKUPEDGE ENCRYPTION WHITEPAPER, MICROLITE CORPORATION at 2 (2003) (describing the technology of asymmetric keys as "new"); Roger Clarke, MESSAGE TRANSMISSION SECURITY (May 1998), http://www.rogerclarke.com/II/CryptoSecy.html ("Public key cryptography is relatively new and technically complex.").

[32] Deepak Panth, Dhananjay Mehta and Rituparna Shelgaonkar, *A Survey on Security Mechanisms of Leading Cloud Service Providers*, in INTERNATIONAL JOURNAL OF COMPUTER APPLICATIONS 98(1) at 34 (July 2014).

117. '181 patent claims transform data from one form into another that will be recognizable by the intended recipient but secure against decryption by unintended recipients. IBM, in its reference guides ("redbooks"), refers to encryption as "transform[ing] data that is unprotected.



*Bertrand Dufrasne and Robert Tondini*, IBM DS8870 DISK ENCRYPTION 6th Edition at 4 (2015) (From a reference guide published by IBM.)

118. One or more claims of the '181 patent require a specific configuration of electronic devices, a network configuration, and the use of encryption systems to secure communications from access by an intermediary.  These are meaningful limitations that tie the claimed methods and systems to specific machines.  For example, the below diagram from the '181 patent illustrates a specific configuration of hardware disclosed in the patent.



'181 patent, Fig. 1.

44

## C.   Information Record Infrastructure Patents

119.    The IRI patents disclose specific computer based systems and methods for electronically structuring and controlling access to protected data in a plurality of external databases.

120.    Over fifteen years ago, Mr. Felscher conceived of the inventions disclosed in the IRI patents, based on his experiences with the limitations in existing systems for controlling access to electronic medical records and protected electronic data.

121.    During Mr. Felscher's work in the field of electronic medical records, he witnessed first-hand the drawbacks to existing computer systems and methods for controlling access to protected data.  Existing systems failed to efficiently transmit unstructured protected information.  '368 patent, col. 3:5-10.  Other problems included the inability to secure the protection of data, integrate content management functions, and create a trust infrastructure wherein an independent third party represents and serves as an agent for the content owner.  *Id*. at col. 3:4-54:16.  The result was an inability to effectively manage access to protective data. The IRI patents disclosed systems and methods that overcome these drawbacks.  The inventions disclosed in the IRI patents improved upon the then-available technology, enabled efficient access control of unstructured data, reduced costs, and ultimately resulted in a more secure system.

122.    Defendants value systems that provide secure systems and methods for controlling access to protected data such as the system disclosed in the IRI patents.

123.    Defendants' competitors, such as Microsoft Corporation and Hewlett Packard Company, have confirmed the importance and value of systems and methods that manage access to protected data.

> Today, the need for data protection and security goes well beyond the realm of access privileges and firewalls.  Organizations of all sizes, in public and private sectors, must not only protect information from unauthorized access and intrusion but also manage how documents, presentations, spreadsheets, and e-mails are handled in the normal course of daily business

HP INFORMATION RIGHTS MANAGEMENT SOLUTIONS ENSURING LIFE CYCLE PROTECTION OF DIGITAL INFORMATION IN MICROSOFT ENVIRONMENTS, HP WHITE PAPER (2005).

> Such cloud adoption within the healthcare industry is gaining momentum because the economic, clinician productivity and care team collaboration advantages of the cloud are undeniable.  However, as was the case for UCHealth, there's ***one fundamental concern that continues to weigh heavily on the minds of providers: Is patient data safe, secure and private in the cloud***.

UNIVERSITY OF COLORADO HEALTH ADOPTS MICROSOFT OFFICE 365 FOR ITS DATA PRIVACY AND SECURITY COMMITMENT, MICROSOFT ON THE ISSUES BLOG (December 18, 2013), http://blogs.microsoft.com/on-the-issues/2013/12/18/university-of-colorado-health-adopts-microsoft-office-365-for-its-data-privacy-and-security-commitment/ (emphasis added).

124.    Academics have confirmed the value of secure information access management systems such as the inventions disclosed in the IRI patents.

> ***With the proliferation of the Internet, the speed and ease of digital data exchange has increased, together with the number of potential parties that can exchange data***.  This has also meant that digital data security is no longer confined to the computer that holds the original data, or even behind corporate firewalls.  Furthermore, data security no longer applies only to the access to data, but also to what the user can do with the data

Alapan Arnab and Andrew Hutchinson, *Digital Rights Management - An Overview of Current Challenges and Solutions*, in PROCEEDINGS OF INFORMATION SECURITY SOUTH AFRICA CONFERENCE (2004) (emphasis added).

125.    Although major corporations offer systems for providing secure access to protected data today, at the time the inventions disclosed in the IRI patents were conceived, systems had significant limitations that were addressed by the inventions disclosed in the IRI patents.

> While "awareness of risks and of possible technical solutions is increasing," the authors would appear to be describing a rather precarious environment, at least in the short run.  The picture does not improve when one focuses on the details of some of the technical fixes.  Barrows and Clayton deem "tight" prospective access restrictions—a "need to know," mandatory access control model—as largely incompatible with the dynamic health care environment.

Reid Cushman, *Serious Technology Assessment for Health Care Information Technology*, JOURNAL OF THE AMERICAN MEDICAL INFORMATICS ASSOCIATION 4(4) (1997).[33]

126.    The claims in the IRI patents describe solutions that are rooted in computer technology to overcome problems specific to and characteristic of complex computer networks

---

[33] This reference is cited on the face of the IRI patents as an exemplar illustrating limitations in systems existing at the time the inventions disclosed in the IRI patents were conceived; *see also* Alapan Arnab and Andrew Hutchinson, *Digital Rights Management - An Overview of Current Challenges and Solutions*, in PROCEEDINGS OF INFORMATION SECURITY SOUTH AFRICA CONFERENCE (2004) (emphasis added) ("none of these products provide for all the needs of an enterprise, and furthermore these products do not offer all the benefits that DRM potentially offers to an enterprise).

where protected data is stored.  For example, academics identified distributed information

systems as leading to new problems regarding information rights management that the IRI

patents solve.

> The development and wider use of wireless networks and mobile devices has led
> to novel pervasive computing environments **which pose new problems for
> software rights management** and enforcement on resource-constrained and
> occasionally connected devices. . . . The latter opens new channels for super-
> distribution and sharing of software applications that do not impose a cost on the
> user.

Ivana Dusparic, Dominik Dahlem, and Jim Dowling, *Flexible Application Rights Management in
a Pervasive Environment*, in IEEE INTERNATIONAL CONFERENCE ON e-TECHNOLOGY, e-
COMMERCE AND e-SERVICE, pages 680–685 (2005) (emphasis added).[34]

> Then there is the cloud.  Cloud, cloud, cloud, it's on every webcast, in every
> article. The cloud has many advantages.  Why wouldn't you want to outsource all
> your costs of network management, storage, system administration?  The cloud
> makes perfect sense but has one massive concern... security.

Simon Thorpe, *Security in the Enterprise 2.0 World: Conflicts of Collaboration*, ORACLE
OFFICIAL BLOG, September 27, 2010, https://blogs.oracle.com/irm/.

   127. Although secure and effective information rights management, in some form, has

been an objective of corporations and researchers for many years ('368 patent, col. 6:61-7:3), the

IRI patents are directed at solving problems that are unique to the realm of computers and

specifically network cloud computing.

   128. The systems and methods disclosed in the IRI patents have particular application

to two primary fields: electronic medical records and electronic rights management.

Shortcomings in available technology at the time the inventions disclosed in the IRI patents were

conceived, lead to the development of the IRI patents.

---

[34] *See also* Aaron Franks, Stephen LaRoy, Miek Wood, and Mike Worth. *Idrm: An Analysis Of
Digital Rights Management For The Itunes Music Store*, TECHNICAL REPORT, UNIVERSITY OF
BRITISH COLUMBIA (2005) ("The need for secure digital rights management (DRM) is more
urgent today than ever before. With the rapid increase in broadband availability, Internet file
sharing has become a threat to content providers' bottom line."); Mike Godwin, *What Every
Citizen Should Know About DRM, A.K.A. 'Digital Rights Management*,' PUBLIC KNOWLEDGE
(2004) ("As circumvention tools evolve, and as new technologies pose new infringement
problems, the locking of industrial sectors into a particular "standard" scheme, mediated and
supervised by government, actually slows the ability of the content sector to respond to new
problems.); HP DIGITAL RIGHTS MANAGEMENT (DRM) FOR NETWORK AND SERVICE PROVIDERS
(NSPs), HP SOLUTION BRIEF (2003) ("DRM [Digital Rights Management] is an emerging
technology with fragmented addressable markets, solution capabilities and standards.").

129.    A brief overview of the state of the prior art in these two areas provides context to understanding the truly inventive nature of the IRI patents.  The specific systems and methods disclosed and claimed in the IRI patents are discussed in detail later in this Complaint.

130.    Background on the state of the art at the time of the inventions disclosed in the IRI patents confirms that the patented inventions are limited to specific computer systems and methods address issues specific to accessing protected data using modern computer networks.

131.    *Information Rights Management*.  The inventions disclosed in the IRI patents have particular application to the management of rights in digital works, to allow a content owner to exploit the value of the works while assuring control over the use and dissemination. The IRI patents address problems specific to and arising from distribution and protected works on the internet.

132.    At the time the inventions disclosed in the IRI patents were conceived, the growth of the internet created unique problems relating to managing rights to protected works.

> There's too much data being collected in so many ways, and a lot of it in ways that you don't feel you had a role in the specific transaction," he [Craig Mundie] said.  "Now that you're just being observed, whether it's for commercial purposes or other activities, *we have to move to a new model.*" . . .  Under the model imagined by Mundie [a] central authority would distribute encryption keys to applications, allowing them to access protected data in the ways approved by the data's owners.

Tom Simonite, *Microsoft Thinks DRM Can Solve the Privacy Problem*, MIT TECHNOLOGY REVIEW, October 10, 2013 (emphasis added) (Craig Mundie is Senior Advisor to the CEO at Microsoft and its former Chief Research and Strategy Officer).[35]

133.    In the late 1990s and early 2000s, information rights management systems had significant limitations.  Prior art systems did not create a trust infrastructure, wherein an independent third party represents and serves as agent for the content owner, implementing a set of restrictive rules for use of the content, and interacting and servicing customers.

---

[35] *See also* Martin Abrahams, *Document Theft - IRM as a Last Line of Defense*, ORACLE IRM, THE OFFICIAL BLOG, August 1, 2011, https://blogs.oracle.com/irm/ ("The relevance of IRM is clear. . . . In a cloudy world, where perimeters are of diminishing relevance, you need to apply controls to the assets themselves.").

134.    Rudimentary information rights management systems such as Microsoft's PlayForSure and RealNetwork's Rhapsody were still years from being released.  Even when these systems were released in 2004 they had significant limitations.  Both systems lacked the ability of a third party to act as an intermediary between a content creator and a user.  The state of the art at the time the inventions disclosed in the IRI patents were conceived underscores the inventive nature of the IRI patents.

135.    ***Electronic Medical Records***.  The IRI patents disclose systems and methods for controlling access to protected health information where the information is stored in one or more external databases.  Systems for controlling access to medical records, contemporaneous to the IRI patents had significant limitations that the IRI patents address.[36]  These systems included: (1) Anonymizing Records.  A method used in contemporaneous systems to the IRI patents is the maintenance of anonymous medical records.  However, such techniques did not provide patients and medical professionals the ability to access patient specific records.  (2) Indexing.  Systems contemporaneous to the IRI patents indexed medical records with anonymous identification codes.  While these systems preserved privacy, these systems made locating a database record other than by patient identifier, or its accession identifier, difficult.  (3) Proxy Systems.  Other contemporaneous systems used a proxy server to protect user privacy.  However, systems using an Internet proxy resulted in a loss of rights and did not act in a representative capacity for the content owner, and did not integrate content management functions.

136.    In addition, access to these early medical records systems was limited to authorized individuals who were on-site, as these systems provided little-to-no connectivity to anyone outside of the organization or to the Internet generally.  Because access was restricted to

---

[36] *See* Reid Cushman, *Serious Technology Assessment for Health Care Information Technology*, J. AM. MED. INFORM. ASSOC. 4: 259-265 (1997) (This article is cited on the face of the IRI patents and finds "Data protection practices in the typical late twentieth-century organization are not very good, even in putatively "secure" institutions. . . The forthcoming study of health care security by the National Academy of Sciences, to be released in February 1997, is expected to reach a similar conclusion.  The widespread deficits in security are hardly a secret; they are common fodder among information systems professionals.").

on-site users on a local network using stationary terminals in designated areas, there was very little emphasis placed on data security.

137.    In sharp contrast – to the flexible, modular, and tightly integrated multi-layer security and access control framework disclosed and claimed in the IRI patents, systems such as Epic System Corporation's CareWeb[37] had significant limitations including: inability to effectively control access on a record-by-record basis within respective external databases, as claimed in several IRI patents; inability to distinguish between records within an external or backend database, the databases accessed through CareWeb were basically opaque to the "CareWeb" system; CareWeb's implementation because of its fixed structure was expressly limited to a particular, monolithic front-end architecture for secure implementation.

138.    At the time the inventions disclosed in the IRI patents were conceived, the medical community showed little sign of implementing a system for controlling access to medical records that were stored in extern databases.  However, computer networks presented new challenges and unique problems that the IRI patents addressed.

> As health care moves from paper to electronic data collection, providing easier access and dissemination of health information, the development of guiding privacy, confidentiality, and security principles is necessary to help balance the protection of patients' privacy interests against appropriate information access. . . . It is imperative that all participants in our health care system work actively toward a viable resolution of this information privacy debate.

Suzy Buckovich, Helga Rippen, and Michael Rozen, *Driving Toward Guiding Principles: A Goal for Privacy, Confidentiality, and Security of Health Information*, J. AM. MED. INFORM. ASSOC. 6 (1999).

139.    The need for a secure system for providing access to medical records was specifically required to address cloud computing where medical records were stored in one or more external databases.

> The healthcare industry is in a major period of transformation and IT modernization.  More than ever, healthcare providers and professionals are faced

---

[37] John D. Halamka, Peter Szolovits, David Rind, and Charles Safran, *A WWW Implementation of National Recommendations for Protecting Electronic Health Information*, J. AM. MED. INFORM. ASSOC. 4: 458-464 (1997) (The limitations of the CareWeb system are discussed in depth in the specification of the IRI patents.).

with the need to be more efficient, reduce costs and collaborate seamlessly as virtual teams to deliver higher quality care for more people at a lower cost point. Healthcare organizations are increasingly looking to cloud technologies to help them meet these goals.  However, a natural concern with using cloud technology is keeping sensitive health information private and secure.

Hemant Pathak, DATA PRIVACY AND COMPLIANCE IN THE CLOUD IS ESSENTIAL FOR THE HEALTHCARE INDUSTRY (December 2013), http://www.microsoft.com/en-us/health/blogs/data-privacy-and-compliance-in-the-cloud-is-essential-for-the-healthcare-industry/default.aspx.

1. **U.S. Patent No. 7,587,368**

140.     U.S. Patent No. 7,587,368 (the "'368 patent") entitled, Information Record Infrastructure, System and Method, was filed on July 5, 2001, and claims priority to July 6, 2000. St. Luke is the owner by assignment of the '368 patent.  A true and correct copy of the '368 patent is attached hereto as Exhibit C.  The '368 patent claims specific methods and systems for securely controlling access to a plurality of digital records by a remote computer.

141.     The '368 patent has been cited by 184 United States patents and published patent applications as relevant prior art.  Specifically, patents issued to the following companies have cited the '368 patent as relevant prior art.

- Microsoft Corporation
- LG Electronics, Inc.
- Canon Kabushiki Kaisha
- Hewlett-Packard Development Company, L.P.
- Voltage Security, Inc.
- Northrop Grumman Systems Corporation
- International Business Machines Corporation
- Mcafee, Inc.
- J.D. Power And Associates
- NEC Corporation
- Electronics And Telecommunications Research Institute (ETRI)
- Koninklijke Philips Electronics N.V.
- Huawei Technologies Co., Ltd.
- Ricoh Co., Ltd.
- Massachusetts Institute Of Technology

142.     The '368 patent claims a technical solution to a problem unique to computer networks – securely transmitting encrypted digital records and controlling access to digital records requested by a remote computer.

143.     At the time of the inventions claimed in the '368 patent, electronically structuring and controlling access to protected data in a plurality of external databases presented new and unique issues over the state of the art.  As explained in the '368 patent: "The present invention

51

therefore seeks to provide a comprehensive set of technologies to address the full scope of issues presented in implementing a secure and versatile information content infrastructure that respects the rights of content owners and users to privileges, such as confidentiality." '368 patent, col. 54:27-33.

144.    Although the systems and methods taught in the '368 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '368 patent claims were innovative and novel.  "Existing systems do not create a trust infrastructure, wherein an independent third party represents and serves as an agent for the content owner, implementing a set of restrictive rules for use of content . . . Thus, existing intermediaries do not act in a representative capacity for the content owner, and do not integrate content management functions." '368 patent, col. 5:4-16.

145.    Further, the '368 patent claims improve upon the functioning of a computer system by allowing encrypted electronic data to be securely transmitted through an intermediary. This improves the security of the computer system and allows it to be more efficient.  "[B]y consolidating a plurality of institutions [referring to digital records stored in external databases], uniformity, interoperability, cost reductions, and improved security result." '368 patent, col. 67:65-67.

146.    The '368 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," or "a building block of the modern economy."  Instead, they are limited to a concretely circumscribed set of methods and systems that provide a conduit for the authorized transmission of digital records, while maintaining the security of the records against unauthorized access.

147.    The '368 patent claims are not directed at the broad concept/idea of "managing digital records."  Instead, the '368 patent claims are limited to a concretely circumscribed set of methods and systems for authorizing and transmitting secure digital records.  These methods and systems are technologies unique to the Internet age.

148.    The '368 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of secure distributed computing.  For example, one or more claims of the '368 patent require encrypting and sending, by the server system, the requested digital record which has been validated, using the public key and the session key to encrypt the digital record - a procedure that overrides the routine and conventional sequence of events in electronic communications, even encrypted electronic communications.

149.    The '368 patent is directed to specific problems in the field of digital record access and transmission.

150.    The preemptive effect of the claims of the '368 patent are concretely circumscribed by specific limitations.  For example, claim 1 of the '368 patent requires:

A method, comprising the steps of:

> storing a plurality of digital records and respective access rules for each digital record in a computer memory associated with a server system;

> receiving a request for access, from a remote computer, to access a digital record stored in the computer memory;

> validating, by the server system, the received request to access the digital record by applying a respective set of access rules for the digital record stored in the computer memory;

> retrieving, by the server system, a public key having an associated private key, and associating a logging wrapper having a respective session key with the digital record, after validating the received request, wherein the session key is distinct from the public key and the private key;

> encrypting and sending, by the server system, the requested digital record which has been validated, using the public key and the session key to encrypt the digital record;

> receiving and decrypting the encrypted digital record, by the remote computer, using the private key, and the session key in conjunction with the logging wrapper;

> generating by the logging wrapper, at the remote computer, a logging event; and

> recording the logging event in an access log.

151.    The '368 patent does not attempt to preempt every application of the idea of controlling access to an encrypted digital record over a computer network.

152.    The '368 patent does not preempt the field of electronically structuring and controlling access to protected data in a plurality of external databases.  For example, the '368 patent includes inventive elements—embodied in specific claim limitations—that concretely circumscribe the patented invention and greatly limit its breadth.  These inventive elements are not necessary or obvious tools for achieving secure third-party communications, and they ensure that the claims do not preempt other techniques for secure communications.

153.    For example, the '368 patent describes numerous techniques for electronically structuring and controlling access to protected data in a plurality of external databases.  The techniques inform the invention's development but do not, standing alone, fall within the scope of its claims:

- Rights-Based Access to Database Records.  U.S. Pat. No. 5,325,294 to Keene, relates to a system that receives and stores the individual's medical information, after the individual is tested to establish this information and the date on which such information was most recently obtained.

- Security Tokens.  U.S. Patent No. 5,978,918 to Scholnick, discloses a back-end process returns a time sensitive token that the "sender" sends to the "receiver."  The "receiver" takes the time sensitive token and uses it to retrieve the private data.[38]

- Role-Based Access.  U.S. Pat. No. 6,023,765 to Kuhn, relates to a role-based access control in multi-level secure systems.

- Secure Networks.  U.S. Pat. No. 5,579,393 to Conner, relates to a system and method for secure digital records, comprising a provider system and a payer system.

- Cryptographic Technology.  U.S. Pat. No. 5,956,408 to Arnold, relates to an apparatus and method for secure distribution of data.  Data, including program and software updates, is encrypted by a public key encryption system using the private key of the data sender.

---

[38] See also Arindam Khaled et al., A Token-based Access Control System for RDF Data in the Clouds at 104,.in PROCEEDINGS OF THE 2ND IEEE INTERNATIONAL CONFERENCE ON CLOUD COMPUTING TECHNOLOGY AND SCIENCE (2010) (discussing the use of a "token-based access control system . . . implemented in Hadoop (an open source cloud computing framework)").

- Watermarking.  U.S. Pat. No. 5,699,427 to Chow, relates to a method to deter document and intellectual property piracy through individualization, and a system for identifying the authorized receiver of any particular copy of a document.

- Computer System Security.  U.S. Pat. No. 5,881,225 to Worth, relates to a security monitor for controlling functional access to a computer system.  A security monitor controls security functions for a computer system.  A user desiring access to the system inputs a user identification and password combination, and a role the user to assume is selected from among one or more roles defined in the system.

- Computer Security Devices.  U.S. Pat. No. 5,982,520 to Weiser, relates to a personal storage device for receipt, storage, and transfer of digital information to other electronic devices has a pocket sized crush resistant casing with a volume of less than about ten cubic centimeters.

- Computer Network Firewall.  U.S. Pat. No. 5,944,823 to Jade, relates to a system and method for providing outside access to computer resources through a firewall.  A firewall isolates computer and network resources inside the firewall from networks, computers and computer applications outside the firewall.

- Virtual Private Network.  U.S. Pat. No. 6,079,020 to Liu, relates to a method and an apparatus for managing a virtual private network operating over a public data network.  This public data network has been augmented to include a plurality of virtual private network gateways so that communications across the virtual private network are channeled through the virtual private network gateways.

- Biometric Authentication.  U.S. Pat. No. 5,193,855 to Shamos relates to a patient and healthcare provider identification system which includes a database of patient and healthcare provider information including the identity of each patient and provider and some identification criteria (such as fingerprint data).[39]

154.    Although "[e]ncryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years,"[40] the '368 patent does not

---

[39] Nary Subramanian, *Biometric Authentication*, in ENCYCLOPEDIA OF CRYPTOGRAPHY AND SECURITY (S. Jajodia and H.C.A. van Tilborg 2nd ed. 2011) ("Biometric authentication is a technique for identifying the person accessing a secured asset . . . by comparing their unique biological features . . . [an] issue with biometric authentication is privacy of personal data.").

[40] *Paone v. Broadcom Corp.,* Case No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279, at *7 (E.D.N.Y. Aug. 19, 2015) (*citing Fid. Nat'l Info. Servs., Inc*., Petitioner, CBM2014-00021, 2015

claim, or attempt to preempt, "some process that involves the encryption of data for some purpose" (or similar abstraction).

155.     The '368 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the Internet or using a conventional computer.

156.     The claimed subject matter of the '368 patent is not a pre-existing but undiscovered algorithm.

157.     The '368 patent claims systems and methods that "could not conceivably be performed in the human mind or pencil and paper."[41]

158.     The '368 patent claims require the use of a computer system.

159.     The '368 patent claims systems and methods not merely for transferring secure information over a computer network, but for making the computer network itself more secure.

160.     The claimed invention in the '368 claims is rooted in computer technology and overcomes problems specifically arising in the realm of computer networks.

161.     The systems and methods claimed in the '368 patent were not a longstanding or fundamental economic practice at the time of patented inventions.  Nor were they fundamental principles in ubiquitous use on the Internet or computers in general.

162.     The asserted claims do not involve a method of doing business that happens to be implemented on a computer; instead, it involves a method for changing digital records in a way that will affect the communication system itself, by making it more secure.

163.     One or more claims of the '368 patent require a specific configuration of electronic devices, a network configuration, and the use of encryption systems to secure

---

WL 1967328, at *8 (Apr. 29, 2015) (both upholding the patent eligibility of patents directed toward encryption).

[41] *TQP Dev., LLC v. Intuit Inc.*, Case No. 2:12-CV-180-WCB, 2014 WL 651935, at *4 (E.D. Tex. Feb. 19, 2014) (finding claims directed to encryption to be patent eligible); *see also Paone v. Broadcom Corp.,* Case No. 15 CIV. 0596 BMC GRB, 2015 WL 4988279, at *7 (E.D.N.Y. Aug. 19, 2015); *see also Prism Technologies, LLC v. T-Mobile USA, Inc.*, 12-cv-124, Dkt. No. 428 at 7 (D. Neb. Sept. 22, 2015) (Finding on cross motions for summary judgment that patents directed at delivering resources over an untrusted network were patent eligible.  "The problems addressed by Prism's claims are ones that 'arose uniquely in the context of the Internet.'").

communications and manage access to secure digital records.  These are meaningful limitations that tie the claimed methods and systems to specific machines.  For example, the below diagram from the '368 patent illustrates a specific configuration of hardware disclosed in the patent.



'368 patent, Fig. 1.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 8,316,237

164.    St. Luke references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

165.    Check Point makes, uses, sells, and/or offers for sale in the United States products and/or services for secure three-party communications.

166.    Check Point makes, sells, offers to sell, imports, and/or uses the Check Point Capsule Docs system, including the "in the Cloud" and "on-premises" deployments (the "Check Point Capsule Docs system" or the "Check Point '237 Products").

167.    On information and belief, the Check Point '237 Products include encryption technology.

168.    On information and belief, the Check Point '237 Products enable sending encrypted information through an intermediary where the intermediary is not able to substantially access the unencrypted message.

169.    On information and belief, the Check Point '237 Products are available to businesses and individuals throughout the United States.

170.    On information and belief, one or more of the Check Point '237 Products is provided to businesses and individuals located in the Eastern District of Texas.

171.    On information and belief, one or more of the Check Point '237 Products comprises a secure distributed information access control system.

172.    On information and belief, one or more of the Check Point '237 Products includes a communication interface (e.g. the Check Point Mobile Access Gateway) which is configured to communicate with, a plurality of independently operating servers—e.g., a plurality of independently operating servers used for "cloud storage."

173.    On information and belief, the diagram below shows the security architecture used by one or more of the Check Point '237 Products.



*Check Point+Acronis Secure Mobile Content*, CHECK POINT SOLUTION BRIEF at 2 (July 14, 2015).

174.   On information and belief, each independently operating server communicates server encrypted information, wherein the server encrypted information is in an encrypted form negotiated between a respective server and an intermediary.  For example, in the cloud storage use case, each independently operating cloud storage server communicates server encrypted storage objects to the Check Point key management system, comprising a key management server and a key management system module on the Check Point Mobile Access Gateway.

*Capsule Docs On-Premises vs. Capsule Docs managed in the Cloud*, CHECK POINT WEBSITE, available at https://supportcenter.checkpoint.com/supportcenter/portal?eventSubmit_doGoviewsolutiondetails=&solutionid=sk103706 (highlighting added).



Check Point Capsule Docs, CHECK POINT WEBSITE, available at https://www.checkpoint.com/products/capsule-docs/#overview.

175.    On information and belief, the server encrypted storage objects are in an encrypted form negotiated between a respective storage server and an intermediary.

176.    On information and belief, the intermediary in one or more of the Check Point '237 Products includes an automated processor configured to communicate with a network using network encrypted information, wherein the network encrypted information is in a form negotiated between a network endpoint (e.g., a user, represented by a distinct client platform) and the intermediary–e.g., the automated key handler of a Check Point key management system.

177.    On information and belief, one or more of the Check Point '237 Products contains an audit database configured to log usage of at least one of the plurality of independently operating servers and the activity of the intermediary.



*Check Point Capsule Docs*, CHECK POINT DATASHEET at 2 (December 18, 2015).

178.    On information and belief, the Check Point '237 Products enable asymmetric encryption.

| Encryption Algorithms | The document content is encrypted with an AES symmetric key. The content key is encrypted with several RSA asymmetric keys (once with the Master key and once per each user/group on the document). | |
|---|---|---|
| | • AES 128<br>• RSA 2048 | • AES 256<br>• RSA 2048 |
| Encryption Keys | • Keys are rotated (i.e. become obsolete) on a monthly/yearly basis, providing maximal cryptographic strength.<br>• Private keys that are stored in the cache on the client machine are only: the key of the logged in user and the keys of the groups that the logged in user is a member of.<br>• The administrator can configure how frequently users must be authorized to store data in the cache. If the user was offline or couldn't be authorized for a longer period than the one configured by the administrator, the cache is deleted. | |

*Capsule Docs On-Premises vs. Capsule Docs managed in the Cloud*, CHECK POINT WEBSITE, available at https://supportcenter.checkpoint.com/supportcenter/portal?eventSubmit_ doGoviewsolutiondetails=&solutionid=sk103706.

179.    On information and belief, Check Point has directly infringed and continues to directly infringe the '237 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for secure three-party communications, including but not limited to, the Check Point '237 Products, which include infringing encryption technologies.  Such products and/or services include, by way of example and without limitation, the Check Point Capsule Docs system.

180.     By making, using, testing, offering for sale, and/or selling encryption products and services, including but not limited to the Check Point '237 Products, Check Point has injured St. Luke and is liable to St. Luke for directly infringing one or more claims of the '237 patent, including at least claims 18 and 19, pursuant to 35 U.S.C. § 271(a).

181.     On information and belief, Check Point also infringes indirectly the '237 patent by active inducement under 35 U.S.C. § 271(b).

182.     Check Point has had knowledge of the '237 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Check Point knew of the '237 patent and knew of its infringement, including by way of this lawsuit.

183.     On information and belief, Check Point intended to induce patent infringement by third-party customers and users of the Check Point '237 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Check Point specifically intended and was aware that the normal and customary use of the accused products would infringe the '237 patent.  Check Point performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '237 patent and with the knowledge, that the induced acts would constitute infringement.  For example, Check Point provides the Check Point '237 Products that have the capability of operating in a manner that infringe one or more of the claims of the '237 patent, including at least claims 18 and 19, and Check Point further provides documentation and training materials that cause customers and end users of the Check Point '237 Products to utilize the products in a manner that directly infringe one or more claims of the '237 patent.  By providing instruction and training to customers and end-users on how to use the Check Point '237 Products in a manner that directly infringes one or more claims of the '237 patent, including at least claims 18 and 19, Check Point specifically intended to induce infringement of the '237 patent.  On information and belief, Check Point engaged in such inducement to promote the sales of the Check Point '237 Products, *e.g.,* through Check Point's user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products

to infringe the '237 patent. Accordingly, Check Point has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '237 patent, knowing that such use constitutes infringement of the '237 patent.

184.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '237 patent.

185.    As a result of Check Point's infringement of the '237 patent, St. Luke has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Check Point together with interest and costs as fixed by the Court.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 8,904,181

186.    St. Luke references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

187.    Check Point makes, uses, sells, and/or offers for sale in the United States products and/or services for secure three-party communications.

188.    Check Point makes, sells, offers to sell, imports, and/or uses the Check Point Capsule Docs system, including the "in the Cloud" and "on-premises" deployments (the "Check Point Capsule Docs system" or the "Check Point '181 Products").

189.    On information and belief, one or more of the Check Point '181 Products include encryption technology.

190.    On information and belief, one or more of the Check Point '181 Products enable sending encrypted information through an intermediary where the intermediary is not able to substantially view the unencrypted message.

191.    On information and belief, the Check Point '181 Products are available to businesses and individuals throughout the United States.

192.    On information and belief, the Check Point '181 Products are provided to businesses and individuals located in the Eastern District of Texas.

193.    On information and belief, the Check Point '181 Products include at least one key handler for securely storing and managing customers' cryptographic keys in the cloud.



*Capsule Docs On-Premises vs. Capsule Docs managed in the Cloud*, CHECK POINT WEBSITE, available at https://supportcenter.checkpoint.com/supportcenter/portal?eventSubmit_ doGoviewsolutiondetails=&solutionid=sk103706 (highlighting added).

194.    On information and belief, the at least one key handler of the Check Point '181 Products includes an interface to a memory which stores a plurality of encrypted records (e.g., a memory containing Check Point-managed cryptographic key records).

195.    On information and belief, each encrypted record has an associated asymmetric encryption key pair (e.g., an associated RSA public key-secret key pair) and is encrypted with a first component of the associated asymmetric encryption key pair.

| | | |
|---|---|---|
| Encryption Algorithms | The document content is encrypted with an AES symmetric key. The content key is encrypted with several RSA asymmetric keys (once with the Master key and once per each user/group on the document). | |
| | • AES 128<br>• RSA 2048 | • AES 256<br>• RSA 2048 |
| Encryption Keys | • Keys are rotated (i.e. become obsolete) on a monthly/yearly basis, providing maximal cryptographic strength.<br>• Private keys that are stored in the cache on the client machine are only: the key of the logged in user and the keys of the groups that the logged in user is a member of.<br>• The administrator can configure how frequently users must be authorized to store data in the cache. If the user was offline or couldn't be authorized for a longer period than the one configured by the administrator, the cache is deleted. | |

*Capsule Docs On-Premises vs. Capsule Docs managed in the Cloud*, CHECK POINT WEBSITE, available at https://supportcenter.checkpoint.com/supportcenter/portal?eventSubmit_ doGoviewsolutiondetails=&solutionid=sk103706.

196.    On information and belief, the at least one key handler of the Check Point '181 Products includes at least one automated processor operating in a privileged processing

64

environment to securely perform the system's most security-sensitive operation: accessing the encrypted data store in order to provide encryption keys.

197.    More specifically, on information and belief, the at least one key handler of the Check Point '181 Products includes at least one automated processor operating in a privileged processing environment, configured to receive a selected encrypted record from the memory through the interface, to negotiate at least one asymmetric session key, and to transcrypt the encrypted message to a transcrypted message in an integral process substantially without intermediate decryption, using a transcryption key derived at least in part from the at least one asymmetric session key.

198.    On information and belief, the at least one key handler of the Check Point '181 Products includes a communication port configured to conduct the negotiation for the at least one asymmetric session key, and to communicate the transcrypted record (e.g., by supplying the resulting cryptographic key to a stream processor, such as the Check Point Mobile Access Gateway, for transparent encryption/decryption of cloud data).

199.    On information and belief, Check Point has directly infringed and continues to directly infringe the '181 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for secure three-party communications, including but not limited to, the Check Point '181 Products, which include infringing encryption technologies.  Such products and/or services include, by way of example and without limitation, the Check Point Capsule Docs system.

200.    By making, using, testing, offering for sale, and/or selling encryption products and services, including but not limited to the Check Point '181 Products, Check Point has injured St. Luke and is liable to St. Luke for directly infringing one or more claims of the '181 patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

201.    On information and belief, Check Point also infringes indirectly the '181 patent by active inducement under 35 U.S.C. § 271(b).

202.    Check Point has had knowledge of the '181 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Check Point knew of the '181 patent and knew of its infringement, including by way of this lawsuit.

203.    On information and belief, Check Point intended to induce patent infringement by third-party customers and users of the Check Point '181 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Check Point specifically intended and was aware that the normal and customary use of the accused products would infringe the '181 patent.  Check Point performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '181 patent and with the knowledge, that the induced acts would constitute infringement.  For example, Check Point provides the Check Point '181 Products that have the capability of operating in a manner that infringe one or more of the claims of the '181 patent, including at least claim 1, and Check Point further provides documentation and training materials that cause customers and end users of the Check Point '181 Products to utilize the products in a manner that directly infringe one or more claims of the '181 patent.  By providing instruction and training to customers and end-users on how to use the Check Point '181 Products in a manner that directly infringes one or more claims of the '181 patent, including at least claim 1, Check Point specifically intended to induce infringement of the '181 patent.  On information and belief, Check Point engaged in such inducement to promote the sales of the Check Point '181 Products, *e.g.,* through Check Point's user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '181 patent.  Accordingly, Check Point has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '181 patent, knowing that such use constitutes infringement of the '181 patent.

204.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '181 patent.

205.    As a result of Check Point's infringement of the '181 patent, St. Luke has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Check Point together with interest and costs as fixed by the Court.

**COUNT III**
**INFRINGEMENT OF U.S. PATENT NO. 7,587,368**

206.    St Luke references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

207.    Check Point makes, sells, offers to sell, imports, and/or uses the Check Point Capsule Docs system, including the "in the Cloud" and "on-premises" deployments (the "Check Point Capsule Docs system" or the "Check Point '368 Products").

208.    On information and belief, the Check Point '368 Products are Information Rights Management products for information stored in the cloud.



*Check Point+Acronis Secure Mobile Content*, CHECK POINT SOLUTION BRIEF at 2 (July 14, 2015).

67

209.    On information and belief, the Check Point '368 Products are available to businesses and individuals throughout the United States.

210.    On information and belief, the Check Point '368 Products are provided to businesses and individuals located in the Eastern District of Texas.

211.    On information and belief, one or more of the Check Point '368 Products include encryption technology.

212.    On information and belief, the Check Point '368 Products comprise a database system with a plurality of digital records, each having an associated set of access rules stored in a computer memory associated with a server system.  For example, on information and belief, the Check Point '368 Products comprise a plurality of cryptographic key digital records, each cryptographic key digital record having an associated set of access rules (e.g., identity-based access rules), stored in a computer memory associated with a server system (e.g., a Check Point key vault).

213.    On information and belief, the Check Point '368 Products comprise at least one interface computer in communication with at least one remote computer (e.g., a remote computer requesting to access files in a target service) receiving a request to access a digital record stored in the target service.

214.    On information and belief, the Check Point '368 Products comprise at least one automated processor, associated with the server system.

215.    On information and belief, the at least one automated processor of the Check Point '368 Products validates the received request to access the digital record (e.g., the cryptographic key digital record) by applying a respective set of access rules (e.g., identity-based access rules) for the digital record stored in the computer memory.

**FEATURES**

- Secure all documents by default upon creation
- Access documents seamlessly, without the need for passwords
- Create document access authorization by group or individual
- View and edit documents on personal computers, iOS and Android smartphones and tablets
- Permissions can be set to: read, edit, print, change classification, remove protection, modify authorized users, print screen, and copy/paste
- Encrypt documents to protect sensitive data
- Verify business document access and use history

**BENEFITS**

- Protect business documents everywhere they go
- Create security when you create documents
- Ensure only authorized individuals and groups have access to documents
- Share and upload documents without the risk of losing data
- Specify how documents can be used by authorized recipients

Check Point Capsule Docs, Check Point Datasheet at 1 (December 18, 2015).

216.    On information and belief, the Check Point '368 Products comprise at least one automated processor, associated with the server system, that retrieves a public key having an associated private key, and associates a logging wrapper having a respective session key with the digital record, after validating the received request, wherein the session key is distinct from the public key and the private key.  For example, an automated processor, associated with the Check Point '368 Products, retrieves a user- and/or group-specific public key certificate having an associated private key, and associates a logging wrapper (e.g., Java cryptographic/access control applet) having a respective session key (e.g., session-specific symmetric cryptographic key) with the digital record (e.g., Check Point '368 Products-managed cryptographic key), after validating

the received request.  The session key (e.g., the session-specific symmetric cryptographic key negotiated between the interface computer and the client) is distinct from the public key and the private key (e.g., the user- and/or group-specific public/private key pair).

| Encryption Algorithms | The document content is encrypted with an AES symmetric key. The content key is encrypted with several RSA asymmetric keys (once with the Master key and once per each user/group on the document). | |
|---|---|---|
| | • AES 128<br>• RSA 2048 | • AES 256<br>• RSA 2048 |
| Encryption Keys | • Keys are rotated (i.e. become obsolete) on a monthly/yearly basis, providing maximal cryptographic strength.<br>• Private keys that are stored in the cache on the client machine are only: the key of the logged in user and the keys of the groups that the logged in user is a member of.<br>• The administrator can configure how frequently users must be authorized to store data in the cache. If the user was offline or couldn't be authorized for a longer period than the one configured by the administrator, the cache is deleted. | |

*Capsule Docs On-Premises vs. Capsule Docs managed in the Cloud*, CHECK POINT WEBSITE, available at https://supportcenter.checkpoint.com/supportcenter/portal?eventSubmit_ doGoviewsolutiondetails=&solutionid=sk103706.

217.    On information and belief, the at least one automated processor of the Check Point '368 Products encrypts and sends the requested digital record, which has been validated, using the public key and the session key to encrypt the digital record, through the interface computer.

218.    On information and belief, the at least one automated processor of the Check Point '368 Products receives, through the interface computer, a logging event from the remote computer based on an operation of the wrapper and at least the session key.



*Check Point Capsule Docs*, CHECK POINT DATASHEET at 2 (December 18, 2015).

219.    On information and belief, one or more of the Check Point '368 Products comprises a database system (e.g. the Check Point Key Vault database) for securely storing and managing access to cryptographic keys.

220.    On information and belief, Check Point has directly infringed and continues to directly infringe the '368 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for secure three-party communications, including but not limited to, the Check Point '368 Products, which include infringing encryption technologies.  Such products and/or services include, by way of example and without limitation, the Check Point Capsule Docs system.

221.    By making, using, testing, offering for sale, and/or selling encryption products and services, including but not limited to the Check Point '368 Products, Check Point has injured St. Luke and is liable to St. Luke for directly infringing one or more claims of the '368 patent, including at least claim 78, pursuant to 35 U.S.C. § 271(a).

222.    On information and belief, Check Point also infringes indirectly the '368 patent by active inducement under 35 U.S.C. § 271(b).

223.    Check Point has had knowledge of the '368 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Check Point knew of the '368 patent and knew of its infringement, including by way of this lawsuit.

224.    On information and belief, Check Point intended to induce patent infringement by third-party customers and users of the Check Point '368 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Check Point specifically intended and was aware that the normal and customary use of the accused products would infringe the '368 patent.  Check Point performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '368 patent and with the knowledge, that the induced acts would constitute infringement.  For example, Check Point provides the Check Point '368 Products that have the capability of operating in a manner that infringe one or more of the claims of the '368

patent, including at least claim 78, and Check Point further provides documentation and training materials that cause customers and end users of the Check Point '368 Products to utilize the products in a manner that directly infringe one or more claims of the '368 patent.  By providing instruction and training to customers and end-users on how to use the Check Point '368 Products in a manner that directly infringes one or more claims of the '368 patent, including at least claim 78, Check Point specifically intended to induce infringement of the '368 patent.  On information and belief, Check Point engaged in such inducement to promote the sales of the Check Point '368 Products, *e.g.,* through Check Point's user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '368 patent. Accordingly, Check Point has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '368 patent, knowing that such use constitutes infringement of the '368 patent.

225.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '368 patent.

226.    As a result of Check Point's infringement of the '368 patent, St. Luke has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Check Point's infringement, but in no event less than a reasonable royalty for the use made of the invention by Check Point together with interest and costs as fixed by the Court.

72

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff St. Luke respectfully requests that this Court enter:

A.   A judgment in favor of Plaintiff St. Luke that Check Point has infringed, either literally and/or under the doctrine of equivalents, the '237 patent, the '181 patent, and the '368 patent;

B.   An award of damages resulting from Check Point's acts of infringement in accordance with 35 U.S.C. § 284;

C.   A judgment and order requiring Check Point to provide accountings and to pay supplemental damages to St. Luke, including, without limitation, prejudgment and post-judgment interest; and

D.   Any and all other relief to which St. Luke may show itself to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, St. Luke requests a trial by jury of any issues so triable by right.

Dated:  August 29, 2016                          Respectfully submitted,


                                                 /s/  Dorian S. Berger_____ _____
                                                 Elizabeth L. DeRieux
                                                 (TX Bar No. 05770585)
                                                 D. Jeffrey Rambin
                                                 (TX Bar No. 00791478)
                                                 CAPSHAW DERIEUX, LLP
                                                 114 E. Commerce Ave.
                                                 Gladewater, Texas 75647
                                                 Telephone: 903-845-5770
                                                 E-mail: ederieux@capshawlaw.com
                                                 E-mail: jrambin@capshawlaw.com

                                                 OF COUNSEL:

                                                 Dorian S. Berger (CA SB No. 264424)
                                                 Daniel P. Hipskind (CA SB No. 266763)
                                                 BERGER & HIPSKIND LLP
                                                 1880 Century Park East, Ste. 815
                                                 Los Angeles, CA 90067
                                                 Telephone: 323-886-3430
                                                 Facsimile: 323-978-5508
                                                 E-mail: dsb@bergerhipskind.com
                                                 E-mail: dph@bergerhipskind.com

                                                 Matt Olavi (TX Bar No. 24095777)
                                                 Brian J. Dunne (CA SB No. 275689)
                                                 OLAVI DUNNE LLP
                                                 816 Congress Ave., Ste. 1620
                                                 Austin, Texas 78701
                                                 Telephone: 512-717-4485
                                                 Facsimile: 512-717-4495
                                                 E-mail: molavi@olavidunne.com
                                                 E-mail: bdunne@olavidunne.com

                                                 *Attorneys for St. Luke Technologies LLC*